1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2                    PINE BLUFF DIVISION

3    ALVIN BERNAL JACKSON,

4                       PETITIONER,

5      v.                              No. 5:03CV00405 SWW

6    LARRY NORRIS,                     October 28, 2011
     Director, Arkansas Department     Little Rock, Arkansas
7    of Correction,                    9:38 a.m.

8                       RESPONDENT.

9

             **EXCERPTED TRANSCRIPT OF HEARING**
10          TESTIMONY OF GILBERT S. MACVAUGH
         BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
11              UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   On Behalf of the Petitioner:

15       MR. JEFFREY M. ROSENZWEIG, Attorney at Law
           300 Spring Building, Suite 310
16         Little Rock, Arkansas  72201-2421

17   On Behalf of the Respondent:

18       MS. PAMELA RUMPZ, Attorney at Law
           Arkansas Attorney General's Office
19         323 Center Street, Suite 200
           Little Rock, Arkansas  72201
20

21

22

23       Proceedings reported by machine stenography and displayed

24   in realtime; transcript prepared utilizing computer-aided

25   transcription.

Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

1      **GILBERT S. MACVAUGH, RESPONDENT'S WITNESS, DULY SWORN**

2              THE COURT:  Please be seated.

3                          DIRECT EXAMINATION

4    BY MS. RUMPZ

5    Q    Dr. Macvaugh, can you state your name for the record,

6    please.

7    A    Gilbert, middle initial S, last name Macvaugh, M-A-C, V as

8    in Victor, A-U-G-H, and I am the third.

9    Q    How are you employed, sir?

10   A    I am a clinical and forensic psychologist in private

11   practice in Greenville, Mississippi.

12   Q    And how long have you been doing that?

13   A    I have been in private practice for about two and a half

14   years.  Prior to that, I worked for five years as the chief

15   forensic psychologist on the forensic services unit at the

16   Mississippi State Hospital in Whitfield, and before that I was

17   in my training.

18   Q    All right.  A copy of your CV is going to be admitted

19   contemporaneously with your report, and so I am not going to

20   belabor your qualifications.  Let me ask you, though,

21   specifically your experience as it relates to Atkins

22   evaluations.

23   A    Well, my experience in Atkins evaluations came, I think in

24   2005 was the first post-conviction Atkins evaluation that I did

25   in Mississippi -- for the Attorney General's office in

1   Mississippi, involving a post-conviction claim of mental

2   retardation, of course.  And since then I have probably done 25

3   evaluations of Atkins eligibility cases or Atkins claimants,

4   both at pretrial court level in capital murder cases and also

5   on post-conviction in both state and federal court.

6   Q    And generally do you know how -- about -- I know there is

7   one you said you couldn't ultimately make a determination on,

8   one of those cases.  How many other times has -- have you found

9   somebody retarded as opposed to mentally retarded?

10  A    I opine and the Judge finds, but my opinion -- it's hard

11  to tell.  I am usually Court ordered, and so I am the Judge's

12  expert.  And I usually go with the data, no matter who hires

13  me.  So I don't really keep track of how many I offered

14  opinions that were helpful to the petitioner or not.  I think

15  it's probably about half and half.

16  Q    And that's what you told me when I contacted you.  You go

17  where the data takes you?

18          MR. ROSENZWEIG:  I am being fairly lenient.

19          THE COURT:  I will sustain the objection to leading.

20      Ms. Rumpz.  You have been leading, and I believe in the

21  interest of time and efficiency -- Mr. Rosenzweig did not

22  object, but I have to sustain that.

23          MS. RUMPZ:  All right.

24          THE COURT:  And after all, this witness is the heart

25  of the matter.  In other words, this testimony is really what

Macvaugh - Direct                                    4

1      we're here about, is what I am trying to say.

2              MS. RUMPZ:  Okay.

3              THE WITNESS:  May I clarify something about the

4      evaluations?

5      BY MS. RUMPZ

6      Q    Sure.

7      A    In Mississippi now, we have for most of our pretrial

8      capital murder cases -- pretty much all of the court orders

9      that I receive ask us to address Atkins.  So I do a lot of

10     capital cases.  So I can't really give you an approximate

11     number.  I have done a bunch.

12     Q    Are you -- go ahead.  I am sorry.

13     A    When I was referring to a number, I think that's more the

14     number of cases that I have testified in, which includes both

15     pretrial and post-conviction Atkins cases.  I have done far

16     more evaluations than have actually gone to court.

17     Q    Are you a clinical or a forensic psychologist or both?

18     A    Both.

19     Q    And can you explain briefly what the difference is between

20     a clinical psychologist and a forensic psychologist?

21     A    Certainly.  A clinical psychologist is a psychologist who

22     has a doctorate degree and license to practice psychology.  A

23     forensic psychologist is a clinical psychologist who

24     specializes in the area of forensic psychology, meaning the

25     application of the principles of clinical psychology to assist

1    the fact finder in answering a psychological question, like

2    competence to proceed legally, criminal responsibility,

3    violence, et cetera.

4    Q    Have you been tendered and accepted as an expert in

5    forensic psychology?

6    A    I have.

7    Q    And can you tell us in what courts that might be?

8    A    That would take a while.

9    Q    Give me a, a -- estimate, a rough estimate.  A few?

10   A    Well, I have to look at my CV.

11           THE COURT:  Let me ask this.  Do you object to his

12   testifying?

13           MR. ROSENZWEIG:  No.  Not at all, Your Honor.

14           THE COURT:  I will let him testify, Ms. Rumpz, and you

15   don't need to go through the qualifications because I know your

16   CV will be an exhibit -- or his CV will be an exhibit attached

17   to his report.  Isn't that correct?

18           MS. RUMPZ:  Yes.

19           THE COURT:  Okay.  Go ahead.

20           MS. RUMPZ:  I have one more preliminary question.

21   BY MS. RUMPZ

22   Q    Dr. Macvaugh, have you written an article about the Atkins

23   decision and how it affects forensic practitioners such as

24   yourself?

25   A    I have.  I have also written a book chapter, and I am

Macvaugh - Direct                        6

1    working on several other book chapters at the time.

2    Q    I am going to give you a copy of this.

3            MS. RUMPZ:  Can I approach?

4            THE COURT:  You may.

5    BY MS. RUMPZ

6    Q    This is your article.

7            MR. ROSENZWEIG:  Are you talking about the one he

8    co-wrote with Dr. Cunningham?

9            MS. RUMPZ:  The one you sent me?

10           MR. ROSENZWEIG:  Yes.

11           MS. RUMPZ:  I have marked this as Exhibit 15, and I

12   understand that there is no objection.

13           MR. ROSENZWEIG:  No objection.  I was thinking about

14   introducing it myself, Your Honor.

15           THE COURT:  All right.  It's received.  It's

16   Respondent's 15.

17       (Respondent's Exhibit 15 received in evidence.)

18   BY MS. RUMPZ

19   Q    How did you come to be hired in this case?

20   A    My memory is that I got an e-mail from you circa mid

21   August of 2010 with some questions about looking for an expert

22   to assist the office of the Attorney General here in Arkansas

23   in a post-conviction Atkins case.  And from there I think I

24   returned the e-mail and then we chatted by phone and at some

25   point after that I was hired by your office.

1    Q    And when you -- when you go and you begin an Atkins

2    evaluation, what -- how do you begin the process of putting

3    this all together?

4    A    Well, I think that different examiners may do things

5    somewhat differently, although there are roughly standards in

6    terms of how to do a forensic mental evaluation.  Basically,

7    the way that I proceed is I try to review as much information

8    as possible before I evaluate the defendant or the death row

9    inmate; that is, any reference that I can get my hands on to

10   become more familiar with the evaluee before the first clinical

11   interview.  And in this case, I reviewed thousands and

12   thousands of pages of information.

13   Q    And that material is summarized in your report on pages 2,

14   3, and 4, correct?

15   A    The listing of the material that I reviewed is on pages 2,

16   3, and 4, but the content of the material is summarized on

17   pages 5 through 61.

18   Q    Okay.

19   A    After I review as much information as I can get with

20   regard to a defendant's medical history, psychiatric history,

21   educational history, mental health history, criminal history,

22   employment history, substance use history, et cetera, and I

23   have all the data that I can get from records, then I go and

24   conduct my clinical interviews and administer psychological

25   testing.  In this particular case, I interviewed and

1    administered psychological testing on two occasions at the

2    Varner Supermax with Mr. Jackson.  And once I complete the data

3    collection, I form my opinions in a case and generate a report

4    if the lawyer who hires me wants me to.

5    Q    And did you -- after you reviewed the thousands and

6    thousands and thousands of pages, you went to Varner Supermax?

7    A    I did.

8    Q    And you evaluated Mr. Jackson?

9    A    I did.

10   Q    What test did you give Mr. Jackson?

11   A    I gave Mr. Jackson several tests, one of the more

12   important tests was the Wechsler Adult Intelligence Sale, 4th

13   Edition.  Dr. Moneypenny described that test earlier today,

14   which is a standardized, comprehensive measure of intelligence.

15   I also administered an achievement test called the Wide Range

16   Achievement Test, 4th Edition, which measures general academic

17   abilities.  I administered three malingering tests.  One is

18   called the M-FAST, a malingering screening test designed to

19   test for symptoms -- malingered symptoms of mental illness, not

20   intellectual problems.

21        I administered another malingering test called the SIMS

22   the Structured Inventory for Malingered Symptomatology, which

23   tests for malingered symptoms of mental illness and malingered

24   cognitive estimates.

25        I also administered a third malingering instrument called

Macvaugh - Direct                                    9

1    the TOMM, T-O-M-M, Test of Memory Malingering.  And I think

2    those are the only instruments I have administered

3    Q    And did you administer the malingering instruments first?

4    A    It depends -- depends on how I think the evaluee or

5    examinee is behaving in the interview.  If -- I am concerned

6    about them getting tired.  If they're going to be interviewed

7    for a long period of time or if they have been up for a long

8    time, I really like to reserve the intellectual assessments for

9    the first thing in the morning so I can get them fresh.

10   Hopefully, they will be putting forth their best effort.  I

11   wouldn't want to accidentally be measuring fatigue in an Atkins

12   evaluation.  So I try to structure that in the way that I

13   capture the best data that I can.  And in this case, I did give

14   the malingering test after the intelligence test.

15   Q    And you saw Mr. Jackson on two different Saturdays?

16   A    Correct.

17   Q    For how long?

18   A    I interviewed him and administered testing for

19   approximately six and a half hours on the first day and

20   approximately three and a half hours on the second day for a

21   total of about ten hours.

22   Q    And did you -- when did you give the malingering

23   assessments?  Both days?

24   A    I gave malingering assessments at both times.  I gave the

25   Test of Memory Malingering, the TOMM, on the first day, the

1    same day that I administered the intelligence test because I

2    wanted to have a contemporaneous assessment of malingered

3    memory deficits at the same time as the intelligence test.

4    Otherwise, it would only be partly helpful to give a

5    malingering test if it wasn't given at the same time as the

6    intelligence test.  One could make an argument, of course, that

7    a person malingered on this day, but not on the day of the

8    intelligence test.

9    Q    Why is it important to test for malingering?

10   A    Well, in an Atkins case, it's paramount.  It's the No. 1

11   rule-out.  If we cannot confirm that the data we're getting on

12   our psychological tests -- which are more scientific than in

13   clinical interviews -- are valid, we can't form valid

14   conclusions about what those tests measure.  So it's very

15   important to get an assessment of a person's probability to

16   feign or malinger symptoms of a mental illness and/or

17   intellectual deficits.  So malingering assessment is forensic

18   psychology 101.

19   Q    And which test did you administer first, malingering

20   assessment?

21   A    The TOMM, T-O-M-M.

22   Q    And that was the first day?

23   A    Along with the intelligence test, the WAIS-4.

24   Q    Could you explain to the Court how the TOMM is

25   administered?

1    A    The TOMM is administered in such a way that the examinee

2    is shown pictures, two pictures at a time, 50 different

3    pictures.  And then they're later asked, among other pictures,

4    "Which picture did I show you previously?"  And then they're

5    selecting the correct picture that they were shown.  They're

6    shown two learning trials and then another optional retention

7    trial.

8         Generally, people that have severe neurologic disease,

9    brain tumors, all sorts of neurologic problems can perform

10   quite well on this test because the concept is they have

11   repeated exposure to the stimuli.  They see the same pictures

12   over and over, and the idea is, with repeated exposure or more

13   exposure to the stimulus, they are going to remember more when

14   asked, "Which pictures did I show you?"  And those who perform

15   in the direction that suggests malingering typically show the

16   opposite pattern.  With more exposure to the stimulus, they

17   perform more poorly.  So it demonstrates that they are able to

18   remember the correct picture, but they are purposefully

19   choosing the incorrect picture, which lowers their score.  And

20   basically when scores are less than 50 percent, less than what

21   somebody would get if they were to simply guess, that is

22   suggestive of malingering.

23   Q    And when you administered this test to Mr. Jackson, what

24   were the results?

25   A    May I refer to my report?

1    Q    Yes.

2            MR. ROSENZWEIG:  And if he could identify what page he

3    is going to --

4            THE WITNESS:  Excuse me.  I have quite a few pages in

5    here.  My psychological testing with regard to the malingering

6    begins on 48, but the data for the TOMM are on page 49 of 61.

7    And on Trial 1, which was the first time he was asked to tell

8    me which pictures I showed him previously, he obtained a score

9    of 23 out of 50, which was less than 50 percent.  On Trial 2,

10   this is after he was shown the same 50 pictures again, he

11   scored 11 out of 50, which is much below chance.  And on the

12   retention trial, the optional retention trial, he scored 16 out

13   of 50.  Scores of less than 45 out of 50 on either of those two

14   trials suggests malingering.  He scored an 11 and a 16.

15   BY MS. RUMPZ

16   Q    And you heard Dr. Moneypenny testify earlier today about

17   the problems -- and you acknowledge this in your report as

18   well -- with the malingering instruments as -- as it's applied

19   to intelligence testing.  Did I get his testimony right this

20   morning?

21   A    I think the issue that was discussed is there is concern

22   that our instruments, which are designed to assess for

23   malingering, particularly malingering of intellectual deficits,

24   are imperfect, meaning we really haven't developed instruments

25   that are specifically designed to assess for malingering

Macvaugh - Direct                                    13

1    intellectual deficits.  We have tests for certain kind of

2    cognitive deficits, like memory problems.  We don't have a test

3    yet to help us understand if someone were to malinger mental

4    retardation, what that would look like.  So we try to

5    extrapolate, based on measures that we have to assess for

6    cognitive malingering, like memory problems or amnesia, and

7    because memory is one element of intelligence, we use those

8    to confer those data.

9          The measures are imperfect.  They are also imperfect

10   because most of the instruments that we do have, they lack

11   sufficient normative data in the standardization for the design

12   of those instruments for persons with mental retardation, which

13   means it's hard for us to determine how people with mental

14   retardation might score on those tests when they're not

15   malingering.  There is a risk of a false positive; that is,

16   identifying somebody as a malingerer when in fact they are not.

17   Q    And do Mr. Jackson's scores on the TOMM give you any

18   indication of whether he was generally -- genuinely malingering

19   or whether it was just a problem with the test instrument?

20   A    In my opinion the test data from the TOMM showed that he

21   was attempting to grossly malinger memory deficits.  Despite

22   the imperfections of the test and despite the inadequacies of

23   the psychometric issues that were involved, in my experience

24   and in my opinion, I think those data are still quite

25   persuasive.

1    Q    And let me back up.  Has there been a little research done

2    about the TOMM and using the TOMM as a malingering assessment

3    with the mentally retarded?

4    A    There have been studies done on the TOMM and all the other

5    iterations of this problem that we have been talking about --

6    the TOMM and other measures designed to assess these things.

7    The studies have been somewhat split.  Some studies advocate

8    the use of the TOMM.  There is one study by Dr. Robert Simon

9    here at your Arkansas State Hospital forensics service.

10   Q    Michael Simon maybe?

11   A    Maybe it is Michael Simon.

12   Q    Okay.

13   A    And he studied offenders who had a diagnosis of mental

14   retardation, administered the TOMM, and that instrument did

15   successfully discriminate between those who were malingering

16   and those who were not for a mentally retarded population;

17   although, he had a small sample, and that was one study.  We

18   try not to hang too much on one study.  Other studies have also

19   been encouraging with the TOMM, and some have not been so

20   encouraging.  But this is a complicated issue because we have

21   different levels of intellectual functioning among those that

22   we consider mentally retarded for these research studies.  And

23   so there may be some variability in terms of lower functioning

24   low functioning individuals and higher functioning low

25   functioning individuals if that makes any sense.

Macvaugh - Direct                                    15

1    Q    It does.  And so tell me about your administration of the

2    SIMS?  How is that administered, first?  Let's talk about that.

3    A    Well, the Structure Inventory Malingering Symptomatology

4    is a measure that typically would be given to the examinee to

5    fill out and answer true or false.  Technically, SIMS requires

6    a fifth-grade reading level.  So in cases like this where I

7    know the reading level is not going to be there for the

8    examinee, I will administer the items orally myself and answer

9    the questions and I fill in the true/false answer myself.  He

10   was malingering grossly on lots of those items as well.

11   Q    Okay.

12   A    I'm sorry.

13   Q    Go ahead and tell us what the cut score is and what the

14   test score was.

15   A    The cut score on the SIMS is 14, and he produced a score

16   of 39.

17   Q    Is that -- is there a difference between malingering and

18   grossly malingering?

19   A    One is more obvious than the other.

20   Q    And is a score of 39 versus 14, is that --

21   A    I'm sorry.  14 is the threshold by which we make a

22   determination if somebody is attempting to fake something or

23   not.  Less than 14 on this test would be suggestive of a person

24   who is not attempting to malinger something.  Scores of greater

25   than 14 would suggest somebody who is attempting to malinger

Macvaugh - Direct                                    16

1    symptoms.  His score was 39.

2    Q    Is that considered grossly malingering?  Can it be?

3    A    Sure.  He was elevated on all five of the subsets.

4    Q    What are the five subsets?

5    A    The five subsets include psychosis, neurologic impairment,

6    amnestic disorders, low intelligence, and affective

7    disorders -- which is another term for mood disorders.  But

8    again, I don't want us to put too much emphasis on one test

9    score.  That score is important.  I think it does suggest

10   malingering, but we have to be clear that that instrument

11   requires a fifth-grade reading level.  Mr. Jackson does not

12   have a fifth-grade reading.  I am very confident of that, and

13   so there is some possibility that he -- because he doesn't have

14   that reading level, he may have been confused.  So that's why

15   we give more than one test, so we look at convergence in the

16   data instead of one score on one test.

17   Q    And you gave three tests?

18   A    I did.

19   Q    And the last test was the M-FAST?

20   A    That's a screening test to test for symptoms of malingered

21   mental illness -- hallucinations, delusions, depression, et

22   cetera.  And his score was above the cut on that as well.  I am

23   losing my page here.  On the M-FAST his score was a 12, and a

24   cut score is 6.  So he was double the cut score.

25   Q    And why would you issue or administer -- and maybe this is

1    self-explanatory -- but why would you administer, like, the

2    M-FAST which malingers psychiatric disorders when we're not

3    dealing with a psychiatric kind of claim here?

4    A    That's a great question.  The reason why I do it is

5    because I like to get a complete picture of the person's

6    clinical functioning.  Even though the psychiatric status is

7    not before the Court, it's important for me to understand this

8    man's psychiatric functioning within the overall context of his

9    clinical picture.  And if he is attempting to malinger

10   psychiatric symptoms within the context of an Atkins claim, to

11   me, I interpret that as being an unsophisticated attempt to

12   malinger everything.  Plus, if a person is suffering symptoms

13   of a major mental illness, that can interfere with your ability

14   to make an accurate determination of their intellectual

15   functioning.  So I do a standard clinical assessment and then

16   tailor the rest of my methods to answering the specific

17   referral questions.

18   Q    And before you did your evaluation, before you went down

19   to Varner Supermax to evaluate and test Mr. Jackson, were you

20   aware of Dr. Glenn White's testimony?

21   A    I was.

22   Q    And what, what -- what did you know about -- what did

23   Dr. White testify to and when did he testify, if you recall?

24   A    As I recall, Dr. White was hired, I think, by the district

25   attorney's office at the time of Mr. Jackson's first capital

1   murder trial to do a standard forensic mental evaluation,

2   competence, et cetera.  In the course of that, in 1990, he

3   attempted to administer intelligence testing to assist him in

4   arriving at an opinion regarding competence, et cetera.  And

5   the scores he reported were considered to be invalid by

6   Dr. Glenn White because he considered Mr. Jackson to be

7   malingering.

8   Q    And did -- well, no, that's fine.

9        You have heard Dr. Moneypenny testify earlier today, and

10  we will get to Dr. Moneypenny's report in a bit.  But while

11  we're on malingering, can you tell the Court about the Rey

12  15-Item test?  And I know Dr. Moneypenny explained that

13  briefly, but what is that test?

14  A    I did hear Dr. Moneypenny's testimony and his response

15  to -- I believe it was your question about whether it was a

16  screening test, and his response was that it was not.  I

17  disagree with that.  The Rey 15-Item memory test is absolutely

18  the screening test.  The test consists of -- it's a very simple

19  task in which you ask the examinee to look at 15 symbols --

20  shapes and symbols.  There are numbers, letters, circle,

21  square, triangle -- 15 of them -- for ten seconds.  And you

22  instruct them to try to remember as many of the symbols as they

23  can remember after viewing them for only ten seconds.

24       And the catch is in its administration instructions.  You

25  administer the test in such a way that you explain to the

Macvaugh - Direct                                      19

1    test -- the examinee that it's a very difficult test.  You will

2    only have ten seconds to remember all 15 of these symbols, and

3    you make it sound like it's just an impossible task.  But in

4    reality it's a very easy task.  People who score less than 9

5    out of 15 are considered to be intentionally malingering.

6    People who score above nine are considered less likely to be

7    malingering.  Mr. Jackson's score was a 9.  And that would have

8    suggested more comprehensive assessment.  His score was on the

9    cut, on borderline, not conclusive one way or the other.  And

10   if I were to have administered a Rey 15-Item memory test, in

11   the case and got 9 out of 15, I would have -- another test

12   would have been necessary because it's inconclusive.

13   Q    Okay.

14   A    I should also add one other bit about the Rey if I may.

15   The Rey 15-Item test, though, is notoriously unreliable for

16   persons of decreased intellectual function.  We do have one

17   study which found, I believe, north of 30 percent of those with

18   mental retardation appeared to be malingering on the Rey when

19   they were not.

20   Q    Now, the intelligence testing you conducted, the WAIS-4

21   and the, what, Wide Range Achievement Testing.  When did you

22   administer those?

23   A    First day.

24   Q    Both of them?

25   A    Yes.

1   Q    And can you tell the Court -- let's start with the WAIS-4.
2   What is that test?  Describe for the Court how that test is
3   administered.
4   A    The Wechsler Adult Intelligence Scale is the intelligence
5   test, and it's administered individually.  The conditions are
6   such that you really need to be able to have a quiet place to
7   administer this test.  It consists of ten core subtests, which
8   measure both verbal and nonverbal intellectual abilities, also
9   measures a person's processing speed and their working memory
10  skills.  So ten core subtests, takes about an hour and a half
11  to administer, sometimes less time depending on how well the
12  person does.  And once this test is administered, it generates
13  different index scores or IQ scores, and we have a total of
14  five for the WAIS-4.  We have the verbal comprehension index
15  score, we have the perceptual reasoning index score, a working
16  memory index score, and a processing speed index score, and
17  then the overall full-scale IQ, which is the global
18  comprehensive score to describe a person's overall
19  intelligence.  The mean is 100, the average is 100, the
20  standard deviation is 15.
21        People who are thought to suffer from mental retardation
22  or intellectual disability are considered to have IQ scores
23  approximately two standard deviations below the mean,
24  approximately 70 or below.
25  Q    What were Mr. Jackson's scores on the WAIS-4?

1    A    I administered the WAIS to him.  He obtained a full-scale

2    IQ of 50, 5-0, which was at less than 0.1 percentile with a

3    confidential interval of 47 to 55.  And that score is on the

4    borderline between low mild mental retardation and high

5    moderate mental retardation.

6    Q    In your opinion is that score a valid score?

7    A    In my opinion it's not.

8    Q    And why is it not a valid score?

9    A    No. 1, it's the lowest score he has produced out of 10 or

10   11 intellectual assessments over the course of his lifetime.

11        No. 2, I had data to suggest that he was more than likely,

12   at least at times, attempting to feign cognitive deficits.

13        No. 3, it was consistent with the test scores obtained by

14   Dr. Glenn White in 1990, who also concluded that he was

15   attempting to malinger intellectual deficits.

16   Q    And the Wide Range Achievement Test, can you describe that

17   test for the Court, please?

18   A    Similar to the intelligence test, individually

19   administered measure of academic abilities consisting of

20   several subscales, the person's reading abilities, sentence

21   comprehension, spelling, math computation, and then overall

22   reading composite score.  And the mean is 100.  That's the

23   average in the population with a standard deviation of 15.

24        Mr. Jackson's score -- his overall reading composite was

25   64, which is at the first percentile.  His math computation

1    score was 55, at the 0.1 percentile.  Spelling, 67, which was

2    at the first percentile.  Sentence comprehension, 58, 0.3

3    percentile.  And word reading, 72, third percentile.  And,

4    again, his grade equivalents for these achievement test scores

5    range from first grade to the fourth grade equivalent.

6    Q    Do you believe the scores that Mr. Jackson obtained on the

7    Wide Range Achievement Tests are valid scores?

8    A    It's hard to say.  I think that his academic abilities are

9    quite impaired, and I say that based on my review of the

10   information in this case from the school system.  He has had

11   several prior achievement test administrations.  He has rarely,

12   if ever, been higher than these scores that I got when I

13   administered this.  Dr. Moneypenny's scores were quite similar

14   as well.  It's difficult to tell.  He may have been putting

15   forward suboptimum effort at times; he may not have been.  But

16   this is not an IQ test; this is an achievement test.  He is

17   low.  I would have expected him to be not quite so low, but he

18   was low.

19        The point with malingering issues is I really have

20   concerns about the validity of all the data I obtained from

21   Mr. Jackson because it's difficult for us to figure out when

22   somebody is attempting to malinger versus when they're putting

23   forth better effort when we know that they're a malingerer.

24   And he wasn't just malingering memory problems.  He was

25   malingering everything -- psychiatric problems, psychosis.

Macvaugh - Direct                                    23

1   Q    And -- well, I will get to that in a minute.

2        Were these scores consistent -- you heard Dr. Moneypenny

3   testify this morning that he thought a score of 50-something

4   was consistent with -- well, I think he initially testified

5   that he thought a score of 50-something was consistent with

6   Mr. Jackson's IQ scores as reported in those Little Rock school

7   records.  Do you think those scores are consistent?

8   A    I do not.

9   Q    And I what do the scores in the Little Rock school record

10  tell you?

11  A    He was administered testing on numerous occasions during

12  his child and adolescent years, and if it's okay with you, I am

13  going to refer to a table in my report which lists all of the

14  administrations of the intelligence testing.  And I am

15  referring to page 58 of 61, at the top of page 58.  And just by

16  eyeballing the pattern in his scores, he was first administered

17  an intelligence test based on the records I reviewed on 26

18  April 1977 at six years of age, which was then the

19  Stanford-Binet Intelligence Scales, and obtained an overall IQ

20  score of 72, which is consistent with the borderline range of

21  mental retardation.

22       However, with test error -- and I believe this was

23  discussed earlier too -- it's not inconsistent with someone

24  with mild mental retardation necessarily either.  When we

25  factor in the test -- the error associated with these tests, a

Macvaugh - Direct                                    24

1    person could have mental retardation and get a score of 72;

2    although, technically that falls into borderline range of

3    classification.

4    Q    Can I stop you there for a second?

5    A    Sure.

6    Q    And that test error, is that the plus or minus 5

7    Dr. Moneypenny mentioned?

8    A    Yep.

9    Q    And so this 72 could be below the 70 cutoff with the plus

10   and minus 5, but it equally and just as likely could be a 77?

11   A    67 to 77 would be the range.

12   Q    Okay.

13   A    He was administered another test, a different instrument.

14   This time it was the WISC-R, W-I-S-C, the Wechsler Intelligence

15   Scale for Children, Revised, on 9 December 1977, at the age of

16   seven.  This was the first administration by a psychologist,

17   that I could tell in the record, Dr. Johnson.  And at that time

18   his overall IQ store was 73, again classified in the borderline

19   range.  And what's notable about that set of scores is that --

20   and maybe I should back up.  In previous editions of these

21   intelligence tests, there was a different breakdown in terms of

22   the structure of the scores.  Before the current instrument

23   that we use, the scores were reported as three different IQ

24   scores -- verbal IQ, performance or nonverbal IQ, and the full

25   scale overall IQ.

1          So back when Dr. Johnson administered the Wechsler

2    Intelligence Scale for Children, Revised, on the verbal IQ,

3    Mr. Jackson obtained an IQ score of 60, which is in the range

4    of mild mental retardation.  However, his performance or

5    non-verbal IQ was a 90, which is average.  Therefore, his full

6    scale IQ, although it is 73 and technically in the borderline

7    range, is not all that meaningful because there is such a

8    significant disparity between his verbal and performance IQ

9    scores, which means that overall full scale IQ is probably not

10   a very reliable measure of his overall intellectual

11   functioning.  It's somewhat skewed.

12   Q    Let me interrupt you and ask you a question before it

13   leaves me, and then we will get back to the graph.  When you

14   are assessing IQ, is it appropriate to diagnose mental

15   retardation based upon just one prong of either of the verbal

16   IQ or the performance IQ?

17   A    In my opinion, no.  And consistent with standards of

18   diagnosing mental retardation in capital cases and in general,

19   the assessment of intellectual functioning must be based on the

20   overall IQ score, not one subpart of an IQ test.

21   Q    And that's known as the composite score?

22   A    The full-scale IQ.

23   Q    Okay.

24   A    It would be unusual to make a diagnosis of mental

25   retardation, in my opinion, based only on the verbal IQ and

1    ignoring, which is basically average range non-verbal IQ.

2    There is a reason why a non-verbal and verbal IQ is required --

3    are required for a full-scale IQ because they're both

4    important.  If we could make the diagnosis with just one, we

5    wouldn't need the other.

6    Q    Okay.  Thank you.

7    A    But back to the scores, at age seven, with Dr. Johnson, he

8    had a 30-point split, and we do have concerns about whether

9    that 73 really means he is a 73 or whether that's just the

10   calculus of those very discrepant scores.  But it's very

11   consistent with the first administration in 1977 on the

12   Stanford-Binet, which was a 72.

13         The next administration was a bit of an outlier, 18

14   February 1982.  He is 11 years old, appears to have been

15   administered another Wechsler Intelligence Scale for Children.

16   This time he gets a 72 verbal IQ and a 95 performance IQ with

17   an overall IQ score of 81, which places him in the low average

18   range.  And, again, we have a significant split between the 72

19   and the 95.  Not quite as much, but it's still statistically

20   significant.

21         There were several other tests administered, which I won't

22   get into because I don't think they should be used for making a

23   diagnosis of mental retardation because they weren't

24   comprehensive and -- unless you would like me to go into those.

25   Q    No, sir.

Macvaugh - Direct                                   27

1    A    The next test he was administered, an actual standardized

2    intelligence test, was 22 September 1986 at the age of 16.  He

3    was given the child version of the WISC, and much like he did

4    the first couple of times he was tested, he had a verbal IQ of

5    62 and a performance IQ of 91, with a full scale IQ of 74.

6    Again, significant split between verbal and performance

7    abilities, placing him in the low to mid borderline range of

8    intelligence overall.

9         And subsequent to those administrations, the only one he

10   has as an adult before his post-conviction evaluations was

11   Dr. White on 7 February 1990 at the age of 19.  At this time he

12   gets for the first time an adult version of the Wechsler

13   Intelligence Scale, the WAIS-R, the revised edition of the one

14   that we are using now.  At that time he obtained a verbal IQ of

15   53, a performance IQ of 48, and a full-scale IQ of 45, which

16   would be the moderate range of mental retardation.  And that's

17   when Dr. White concluded that he was malingering.

18   Q    Do you recall where Dr. White opined that Mr. Jackson's

19   actual intellectual abilities fell?

20   A    I want to say he thought he was functioning on the

21   borderline range, but I am not 100-percent certain on that.

22   But he may have been referring to what was in the record prior

23   to that.  But to get back to your original question, did I

24   agree with Dr. Moneypenny's assessment whether or not

25   Dr. Moneypenny's scores were consistent with the rest of the

1  scores in the record.  And my disagreement with that is

2  Dr. Moneypenny's scores were not consistent with the scores

3  from the previous administration because Dr. Moneypenny's

4  scores place him in the mild mental retardation; whereas, none

5  of the previous scores did that.  And all of the previous

6  scores demonstrated significant disparity between verbal and

7  performance IQ, which is not evidenced by Dr. Moneypenny's

8  scores or my scores or Dr. White's scores.

9  Q    And what does that difference in the three later tests --

10  Dr. White's test, Dr. Moneypenny's test, and your test -- what

11  does that indicate to you?

12  A    Well, the first common thread with all three of those

13  evaluations is that there was a medical/legal context for all

14  three.  And in medical/legal context, of course, the

15  possibility that the person may be more motivated to malinger

16  is much stronger.  When he is tested in the school system at

17  the ages of 6, 7, 11, and 16, there really isn't going to be,

18  unless it's for a determination of Social Security benefits --

19  and I don't think any of these test administrations were.  They

20  were for educational programming.  There is less incentive to

21  malinger.

22       When he is charged with capital murder and in the middle

23  of an Atkins appeal, there is much incentive to malinger.  And

24  within all three administrations within the context of a

25  forensic referral, there are -- at least with two of them,

1    there were concerns about malingering -- Dr. White and myself.
2    Whereas, none of the other ones which yielded higher scores was
3    there any incentive to malinger.
4    Q    I don't know the answer to this, but I am going to ask it
5    anyway, which they say is a bad thing when you are a lawyer.
6    Do you have an opinion on whether Mr. Jackson may have
7    malingered during Dr. Moneypenny's assessment?
8    A    I would be speculating.  I wasn't there.  I didn't observe
9    his behavior.  I am skeptical of Dr. Moneypenny's data.  Let's
10   put it that way.  Dr. Moneypenny didn't adequately assess for
11   malingering in my opinion, so it's hard to tell.  I would be
12   shooting from the lip.
13   Q    Did the similarity in the scores in the medical/legal
14   context that you have just discussed, does that raise a red
15   flag?
16   A    Absolutely.
17   Q    Okay.
18   A    But without any real valid contemporaneous assessment of
19   effort beyond the Rey, which was inconclusive, it's hard to
20   tell.
21   Q    Did you do, in conjunction with your testing, what is
22   known as a clinical interview of Mr. Jackson?
23   A    I did.
24   Q    What is involved in a clinical interview?
25   A    Generally, a clinical interview consists of a history

1    taking, asking the patient about their life and their

2    experiences and how they did in school and how many mental

3    health professionals they have ever seen and were they ever

4    treated with medications and what arrest history they have had

5    and -- just to get a sense of what the person's mental

6    functioning is.  It's a little bit artificial to come in and

7    meet somebody and just administer a bunch of tests and walk out

8    with these scores and expect that these scores provide a

9    complete picture of the individual that's testing.

10        The clinical interview is important to get a sense of what

11   this person's personality is like, what their clinical function

12   is like, do they have symptoms of a mental illness, do they

13   appear to be manipulative, somehow trying to control the

14   interview.  All those things provide helpful data in terms of

15   the overall assessment.  And in a clinical interview, we are

16   generally looking for assessing obvious psychiatric problems,

17   intellectual problems, memory functioning, et cetera, and

18   collecting information.  And a clinical interview is helpful

19   because generally people who are likely to malinger are less

20   likely to malinger in a clinical interview because they don't

21   understand that you are collecting data about the mental

22   functioning when you are asking questions about the football

23   game, et cetera.

24   Q    Okay.  And why is it important prior to an evaluation or

25   prior to testing to read thousands and thousands and thousands

1    of pages of material like you did here?

2    A    More data, less error; less data, more error.  That's the

3    simplest way that I can describe it.  I ignore nothing.  As

4    much information as I can get about somebody, I want to see it.

5    That's why you sent me telephone calls and pictures and

6    transcripts from capital murder proceedings that didn't have

7    anything to do with why we're here.  It's all relevant to the

8    extent that my ability to assess a person's intellectual

9    functioning will be supplemented by information outside of the

10   immediate assessment; meaning, if I can look at his pleading

11   colloquy with the Judge when he took a plea in some other case,

12   did he talk about his rights and understanding his rights and

13   so forth in a different context.  That gives me helpful data

14   that are useful in determining a person's functioning when it's

15   not immediately within the context of the Atkins eligibility.

16   So I -- there are multiple streams that flow into this river,

17   is the best way of saying it.

18        Anything that I can get to try to make an inference about

19   a person's intellectual cognitive/personality/psychiatric

20   functioning is data that I need to review.

21   Q    Is some -- not in quantity, but some in quality, I guess.

22   Is some information more important than other information?

23   A    Sure.  And some is more valid than others, and some is

24   misleading and can be misleading.  So we have to be careful

25   about how much weight we attach to certain types of data.  For

1    example, I may want to talk to Mr. Calvin Jackson to collect

2    data, but I may not attach as much weight to the data that I

3    get from Mr. Calvin Jackson for lots of different reasons.  But

4    I still want to talk with him.

5    Q    And let's talk about that while it's on the table.  Did

6    you speak with Mr. Calvin Jackson in this case?

7    A    I did.

8    Q    And what did he tell you about his ability to -- I guess

9    for want of a better word -- observe Mr. Alvin Jackson during

10   his developmental or teenage years?

11   A    Well, we had a hard time connecting by phone.  I think we

12   talked three or four different times and, you know, he appeared

13   to be a busy man with his family and his jobs.  I think he had

14   a couple of different jobs and he was always at work and it

15   wasn't always convenient for him to talk.  I think we

16   eventually talked for about an hour, and he gave me roughly the

17   same overview that was described in Dr. Moneypenny's report and

18   what he testified to today.

19        I felt like Calvin was credible.  I did not have the sense

20   that Calvin was attempting to grossly exaggerate his brother's

21   limitations.  Calvin struck me as being sort of honest and --

22   in his descriptions of what their lives were like growing up

23   and the problems that his brother had.  I don't think Calvin

24   was sophisticated enough to make attributions in terms of what

25   problem he thought his brother had as belonging to what kind of

Macvaugh - Direct                                        33

1   disorder.  But he was able to provide sort of concrete examples

2   of the problems his brother had, which appeared credible to me.

3        He had problems remembering certain things, though.  He

4   did not recall that his brother had ever used street drugs.

5   That was not consistent with the other data that I had

6   available to me and the other records that I reviewed.  He also

7   told me that he was not able to observe a lot of the stuff that

8   I was asking about because he wasn't around his brother because

9   his brother had been incarcerated not only in juvenile

10  detention, but in a training school and prison.  And so that

11  kept him from being able to observe a lot of stuff in order to

12  be answering the questions that I had.

13  Q    I am going to back up a bit.  You testified that in

14  your -- in your opinion, Mr. Jackson had some academic

15  difficulties.

16  A    Correct.

17  Q    I think that's pretty clear.

18  A    Absolutely.

19  Q    And can you say that those academic difficulties are

20  attributable to mental retardation?

21  A    Well, I can't say whether he has mental retardation, so --

22  Q    I guess we are putting the cart before the horse?

23  A    My opinion as to mental retardation is that I cannot form

24  one, for the fact that I thought he was malingering and lots of

25  other things which we could get into if you like.  I do think

1    he has genuine academic deficits.  This is an individual whose

2    formal schooling experience consisted of severe behavioral

3    problems to the point that he had to be removed from the

4    classroom as young as seven or eight because he was considered

5    to be too dangerous to be in a classroom.  He didn't really

6    learn the important academic skills that he needed to learn.

7    Why not?  In part because of severe behavior problems, conduct

8    disorder as a child.

9        He also appeared to be suffering from symptoms of ADHD,

10   attention deficit hyperactivity disorder, which was largely

11   untreated based on the information that I reviewed.  And with

12   all of those factors preventing him from successful academic

13   achievement, he wasn't able to learn anything.  And over time

14   he continued to have trouble learning things because he missed

15   a lot of basics because the behavior was bad.  And so the

16   academic achievement tests are going to measure what his formal

17   academic achievement was in school.  If he was not there the

18   day they covered math, he was not going to know that.  If he

19   was not there on the day that they had vocabulary and reading,

20   he is not going to know that.

21       He has some functional skills, in my opinion, just based

22   on his writings and so forth.  But he is quite limited in terms

23   of his expression for written material and also in terms of his

24   understanding of written material.

25       The difficulty of trying to figure out what caused that is

1    that he also appears, at least in my opinion, to have a type of

2    language disorder, which now we call communication disorder or

3    an expressive or receptive language disorder.  And he has

4    elements of other language disorders too, like the stuttering.

5         He testified today -- I think you probably heard his

6    stutter.  His brother talked about his speech problems early

7    on.  That's common with people with language disorders.  But

8    generally, these IQ scores with that significant 30-point

9    disparity between verbal and performance abilities on those

10   intelligence tests also suggest a language disorder, like an

11   expressive or receptive language disorder or some kind of

12   organic basis for that problem, probably in the left hemisphere

13   of his brain, not mental retardation.

14   Q    A language disorder is not mental retardation?

15   A    Correct.  They're different disorders; although, people

16   that have mild mental retardation can also have language

17   disorders.  It's a mixed bag.

18   Q    Or not?

19   A    Or not.  And people with mental retardation may also not

20   have language disorders.  I mean it goes both ways.  We can't

21   say that because he appears to have a language disorder, that

22   rules out the possibility of mental retardation because

23   somebody can have both.  I don't think that that's consistent

24   with the test scores before the age of 18 in this case because

25   his test scores were above the cut for mental retardation, but

Macvaugh - Direct

1    still suggest a language disorder.

2    Q    Let me back up.  A diagnosis of mental retardation is not

3    consistent with his earlier scores; is that what you are

4    saying?

5    A    Correct, but may I explain?

6    Q    Sure.

7    A    This is complicated.  These scores are not exact.  This is

8    not an exact science.  Psychometric measurement can be

9    imprecise at times.  We have to consider these scores within

10   the context of the error because we're really going to be

11   less -- we're going to be correct more often if we say that his

12   score is between these two points than if we try to say his

13   score is right here every single time.  But generally, looking

14   at the pattern of his scores, the pattern suggests that he is

15   above the cut for mental retardation.  He is squarely in the

16   low to mid borderline range, and when we consider what about

17   the test error of plus or minus five points -- at a certain

18   point, when you have repeated administrations of multiple

19   different tests that have roughly the same conclusion, you have

20   less concern about the error in those scores because the error

21   conceptually is what we use to describe the possibility that

22   one score might not be correct, but when you have lots of

23   scores that all fall in the same approximate area or range,

24   then there is probably less error associated with each of those

25   scores because we have evidence of consistency across multiple

1    administrations.

2    Q    Do you have an opinion on whether untreated ADHD can

3    affect a score obtained on IQ tests?

4    A    I do.

5    Q    What is that opinion?

6    A    The answer is, yes, they absolutely can have a dramatic

7    effect on test scores.  When a kiddo who is suffering from

8    active symptoms of hyperactivity, inattentiveness,

9    distractibility, et cetera, is untreated, that can artificially

10   decrease test scores on intelligence tests.  I see that

11   regularly.  I do Social Security disability evaluations on

12   children who sometimes have ADHD, and it does impact the

13   scores.

14   Q    Go ahead.

15   A    Problem in this case is we can't really tell for which

16   administrations he may have been treated with medicines and

17   which ones he may not have been treated.  And so we don't know

18   how much to interpret his existing scores as being related to

19   only intellectual problems or intellectual problems exacerbated

20   by untreated ADHD.

21   Q    Which is another problem with the data in this case?

22   A    True.  There were many problems with the data in this

23   case.

24   Q    Let's go right there.  What other problems did you see

25   with the data in this case?

1    A    These assessments of intellectual disability and mental

2    retardation, especially in post-conviction cases like this

3    where the person has been incarcerated for so long, it's next

4    to impossible to adequately assess the second prong of the

5    diagnosis, which is adaptive functioning.  So we have many,

6    many problems in terms of getting reliable and valid data in

7    order to answer one-third of the entire diagnostic criteria.

8         But with regard to the intelligence testing, there are

9    lots of threats to the validity of the scores because of issues

10   related to practice effects.  You know, lots of these tests

11   have been administered repeatedly, and it is possible for

12   people to improve in their scores on certain subtests, not all

13   of them, simply because of practice.  The non-verbal subtests

14   are especially common offenders there because once they have

15   seen the stimulus, it's no longer novel to them.  And most of

16   these timed tests, if they're able to respond quickly because

17   they remember the strategy they used to solve the task before,

18   they are going to look like they are solving it quicker.  They

19   are really remembering, and they will have higher scores.

20   That's a confound.

21        We talked about the standard measure for error, which

22   means we need to interpret these scores as not precise, but as

23   existing within this range of error.  And all of his scores are

24   right in that area.  It really could go either way.  And then

25   there is a Flynn effect.  I don't think anyone has talked about

Macvaugh - Direct                                    39

1    the Flynn effect today, but that's the idea that the text

2    scores can be artificially increased because of test

3    obsolescence.  The tests become out of date, and we have to

4    develop new tests every 15 or 16 years because tests just --

5    they no longer are centered with that mean at 100.  It's not

6    that people get smarter.  It's just that our tests that we are

7    measuring intelligence become out of date and we have to

8    readjust the mean at 100.

9         So sometimes unfortunately what happens is if an

10   out-of-date test is given, a score can be higher than what it

11   should be, not because a person is smarter than they are, but

12   the test is out of date.  I couldn't determine, based on all

13   these previous administrations, exactly what version of the

14   test was administered.  Many of them I learned about through

15   reading the testimony at the sentencing phase of his capital

16   murder trial.  They weren't real specific about dates or which

17   version, and I don't have a whole lot of confidence in all

18   these administrations being done by a licensed psychologist who

19   was trained to administer intelligence tests.  I couldn't

20   confirm the raw data in other words.

21   Q    Because you didn't have it?

22   A    Correct.

23   Q    And the Flynn effect, can you tell whether or not that

24   applies in this case?

25   A    It could apply to some of his previous scores, but I was

Macvaugh - Direct                                    40

1    unable to calculate how much, if at all, because I didn't have
2    much confidence that the score -- I have to know the dates that
3    the test was measured -- I mean, was administered and I would
4    need to figure out which version of the test was given.  If
5    they were giving an out-of-date test when a newer test was
6    available, that might automatically decrease the score right
7    there.  But I couldn't determine that in some cases because
8    they didn't specify and I didn't have the actual reports from
9    which the person was referring to on the stand in 1990 and,
10   again, in 1995 or '96 when all this was discussed.
11   Q    Can substance abuse have an effect on intellect?
12   A    Absolutely.  A person can chronically abuse substances and
13   have brain damage as a result of that, and that would influence
14   their performance on intelligence tests.  In this particular
15   case, since you are asking about substances and I am talking
16   about brain damage, Mr. Jackson was diagnosed as having brain
17   damage at the age of seven by Dr. Deyoub at the Children's
18   Hospital or University Hospital.  There was some concern of
19   encephalopathy even at the age of seven, possibly a lesion or
20   something in the left hemisphere.  That was clear in the
21   record.
22   Q    Okay.  Are you aware of especially guidelines for forensic
23   psychology that guide forensic practitioners such as yourself
24   in cases like this?
25   A    I am.

Macvaugh - Direct                    41

```
1    Q    And do you consider them to be authoritative and

2    guidelines that you should follow when you are doing an Atkins

3    evaluation?

4    A    I do.

5    Q    And what do those guidelines say about corroborating your

6    data?

7    A    Forensic clinicians have the extra burden that

8    non-forensic clinicians don't have, which is to make sure that

9    in making conclusions, you attempt to seek additional sources

10   of information, to look for consistency in the data.  In other

11   words, you don't take the defendant's word for it when they

12   told you that they were crazy at the time of the alleged

13   murder.  You have to review police reports.  You have to talk

14   to witnesses.  You have to look at records of previous

15   admissions to mental hospitals to see if there was any evidence

16   of a mental illness at the time around the alleged offense.  I

17   am describing an insanity defense evaluation to give you an

18   example.  We don't just place our opinions on one source of

19   data.  We have to make sure that those data are corroborated by

20   other sources of data, meaning our conclusions have got to be

21   supported by more than one source.

22   Q    Did you see that Dr. Moneypenny had done that in his

23   report?

24   A    It appeared that Dr. Moneypenny had administered some

25   tests, talked to Mr. Jackson's brother, reviewed some
```

Macvaugh - Direct                          42

1    information, but I didn't see that there was a lot of attempt

2    to corroborate information he obtained from Mr. Jackson's

3    brother or Mr. Jackson.

4    Q    All right.  Is there a guideline that guides your practice

5    regarding -- I don't exactly know how to phrase it, but

6    basically examining the issue from all perspectives?

7    A    There are and not just in the guidelines for forensic

8    psychologists.  This is true for our ethics code, code of

9    conduct for psychologists.  It's misleading to the Court if we

10   don't do a thorough job, and so we are expected to collect data

11   and look for additional data that confirm those data.  And

12   that's sort of expected in all situations really, but

13   especially in forensic cases where the consequences of our

14   mistakes are so great.

15   Q    And Dr. Moneypenny did make several mistakes in his

16   testing, correct?

17   A    I did find some scoring errors in his administration of

18   the intelligence testing.  Most of them were inconsequential,

19   but there was one that may have had some impact.

20   Q    And, in fact, he administered a test incorrectly.

21   Something about slashes and X.  Can you explain that?

22   A    Sure.  There is one test called Symbol Search, which

23   basically it's a timed test that has more to do with processing

24   speed and a person's ability to choose from two target symbols,

25   whether or not it's consistent with some other response options

Macvaugh - Direct                                    43

1    that contain symbols.  And they are supposed to put an

2    X-through on their answer to illustrate what their answer is.

3    But instead, when Mr. Jackson was administered the test by

4    Dr. Moneypenny, Mr. Jackson's responses were not one slash.  He

5    did an X, which is two slashes, which takes twice the amount of

6    time to respond to one test item on that subtest.  So when I

7    reviewed his raw data, I noticed that the slash, the one slash

8    mark was not present, and they all had X marks, which means

9    that they took double the amount of time on a timed test,

10   decreasing the score.

11       That's one example.  There were others.  Some in the

12   making -- well, some of the test scoring errors gave more

13   credit to Mr. Jackson than he deserved.  They were

14   bi-directional; I will put it that way.

15   Q    And ultimately, I think, it didn't make any difference --

16   didn't make any difference to Dr. Moneypenny's scoring?

17   A    I don't think it would have changed the overall scores.

18   Q    But it's bad practice?

19   A    Well, I think we all make mistakes.  I have made scoring

20   errors.  My colleagues have made scoring errors.  It happens.

21   But we have to try to do a very precise job, especially when an

22   IQ score can impart -- make the difference between whether

23   somebody is eligible for the death penalty or not.  It's

24   serious business, something we want to take seriously, check

25   our scores, double check our scores, make sure the scores we're

Macvaugh - Direct                          44

1    putting in the report when someone's life is hanging in the

2    balance are accurate.

3    Q     Is there a guideline that governs forensic professionals

4    regarding the use of testing instruments outside of the way

5    they're normed or intended to be used?

6    A     Yes.  I do have ethical guidelines and principles with

7    regard to the use of assessment instruments.  If we're going to

8    use assessment instruments in a way that it's a departure from

9    the manner in which the test was designed, we have to clearly

10   state that in our report and qualify our opinions based on

11   that.  We have to always state the limitations of the data.

12         The TOMM, for example, in this case -- I administered the

13   TOMM.  I know there are problems with the TOMM.  It's one of

14   the better ones that we have.  Just because we have a problem

15   with the test not having sufficient normative data, we don't

16   just not give the test and then act like we don't need to

17   assess for malingering.  As I stated earlier, that's the No. 1

18   rule-out in a forensic case.  So we have to give the test, but

19   we also have to state the limitations of that test, which I do

20   in my report.  I did not find any cautions or limitations about

21   any of the tests or any of the data in Dr. Moneypenny's report.

22

23   Q     And specifically, let's turn to the ABAS II that was

24   filled out by Mr. Calvin Jackson.  Are you familiar with that

25   test?

1    A    I am.

2    Q    Have you administered that test?

3    A    I would not refer to it as a test.  It's an instrument.

4    Q    Have you administered that instrument?

5    A    I have.

6    Q    Numerous times?

7    A    Not numerous times.  Most the time the test is not

8    appropriate for these kind of cases, and so I don't give it.

9    Q    Why is that?

10   A    It wasn't designed for this purpose.  The ABAS, Roman

11   numeral II, was designed to assess current functioning,

12   adaptive functioning, present functioning, and because of

13   post-conviction Atkins evaluation such as this requires for a

14   retrospective assessment of adaptive functioning, the

15   instrument was not designed for that purpose.  And it is

16   questionable in terms of the standardized administration

17   procedures to administer in such a way that it was not

18   intended.

19   Q    And is that --

20   A    I don't do it for that reason.  And I also don't do it

21   because it's a matter of great controversy in the field.  Some

22   commentators do advocate using the measures in that way, but

23   the recommended procedure would be to code the person's age on

24   the instrument as if it were their age at the time before the

25   age of 18.  For example, if Dr. Moneypenny were to give this to

1    Calvin, in my opinion, if he was going to proceed the way some

2    experts in the field think that you should in this situation.

3    He would have coded today's date as 1986.  And then, on those

4    norms for a 16-year-old, would have tried to deduct what the

5    adaptive deficits would have been.

6         But instead, he coded them for the date that he actually

7    filled out the instrument, and Mr. Jackson was 41 years old,

8    which means those scores were based on the norms for a

9    41-year-old, except that he wasn't measuring present

10   functioning of a 41-year-old because we can't measure that

11   function for someone in prison because it's a structured

12   environment.

13        The assessment of adaptive functioning for the purpose of

14   diagnosing mental retardation has to be based on their adaptive

15   functioning in the community when they're left to their own

16   devices, before the age of 18 preferably.  So there are lots of

17   problems giving an instrument like that, especially in this

18   case as administered by Dr. Moneypenny, and then there were no

19   cautions or limitations about possible misleading findings in

20   the report.

21             THE COURT:  Ms. Rumpz, you have got about six minutes.

22             MS. RUMPZ:  Before I have to be done?

23             THE COURT:  I am quitting at 5:30.  I am not saying

24   that we are done.  We are done for the day.  And we only set

25   aside one day for this, and it means I am going to have

1    reschedule it.  I don't do my own scheduling.  Cecilia Norwood

2    does that.  But we will have to come back, and I want you-all

3    to tell her how much time you need.  And I hope you can be more

4    accurate than you were this time because I know that this

5    expert, for example, has had to come from Mississippi, and

6    if -- you know, if we had had Mr. Ellis testify, we wouldn't

7    have even gotten to this expert.

8          So keep in mind that I take breaks.  We go to lunch.  You

9    know, in other words when you get -- when you try to estimate

10   the time you need.  So -- and you-all just get together and

11   figure -- try to figure out how much more time you need.

12               MS. RUMPZ:  I will be happy to.

13               THE COURT:  All right.

14   BY MS. RUMPZ

15   Q    Did you do an -- and tell me if I am using the wrong

16   word -- evaluation of Mr. Jackson's adaptive deficits?

17   A    In some ways, yes, and in some ways, no.  I could not form

18   an opinion to a reasonable degree of certainty as to the first

19   prong, which is his intellectual functioning.  That's the most

20   important component of this issue diagnostically.  If he has

21   significantly subaverage intellectual functioning, 75 or below,

22   I would move on to assess for adaptive functioning.  Because I

23   was unable to assess, because of the malingering and the other

24   issues that we have talked about, and I couldn't form an

25   opinion really about the IQ prong, it -- it doesn't make a

Macvaugh - Direct                                        48

1    whole lot of sense for me to try to then evaluate for adaptive

2    functioning when I couldn't make up my mind about the first

3    prong.

4         I did assess for that in terms of my review of all the

5    material.  I described lots of this in my report, the

6    disfunction in prison, et cetera.  Again, this is all difficult

7    because what he does in prison is not a valid index of his

8    adaptive functioning that's necessary for a diagnosis of mental

9    retardation.  That has to be based on his functioning in the

10   community.  There were too few data in my opinion to arrive at

11   a valid opinion with regard to adaptive functioning at the age

12   of 18.  Both parents were deceased.  There were no caretakers

13   who were taking care of him, basically, available to be

14   interviewed and give adaptive measures retrospectively.

15        Calvin was the only person.  I have attempted to call his

16   sister, Mary Maulden.  She didn't call me back.  Calvin, as we

17   talked about, I did talk to him.  I don't think that he is an

18   appropriate person for an adaptive measure anyway because he

19   is -- he is his twin brother, and there are lots of reasons why

20   I have concerns about that.  You can give an adaptive measure

21   to a family member.  You can even give it to a brother, but

22   because this was his twin brother and he wasn't really in a

23   caregiver role, it would be sort of artificial to say:  Imagine

24   when you were 17 or 18, Calvin, and tell me what your brother

25   can or can't do.  Instead, Calvin would be giving us that

Macvaugh - Direct                                    49

1    information based on his memory of his brother, and we have

2    lots of research to show memory is not very reliable for those

3    kind of things.

4    Q    Let me ask you -- I had a question, and I think I have

5    lost it.

6            THE COURT:  Well, let's just break.

7            MS. RUMPZ:  All right.

8            THE COURT:  I will not take this matter under

9    advisement until all of the testimony has been completed.  How

10   much more direct examination, Ms. Rumpz, do you think you have?

11           MS. RUMPZ:  An hour.

12           THE COURT:  All right.  And I am sure Mr. Rosenzweig

13   needs at least an hour.

14           MR. ROSENZWEIG:  Probably more than.  Hour and a half,

15   two hours at least.

16           THE COURT:  Well, you talk to Cecilia about a time.  I

17   will review his testimony as well as all the other testimony

18   before we are together again.  So I do not want -- I want you

19   to avoid cumulative testimony.  I will -- I have given you

20   permission to -- I guess you need an order.  So file a motion,

21   and I will do an order.

22           MR. ROSENZWEIG:  For a deposition?

23           THE COURT:  For the deposition.  For access to

24   Mr. Ellis for the deposition.

25      I have no idea when we can schedule this, but I will

1    certainly try to do it as soon as practicable.  And I know that

2    Mr. Macvaugh has to travel from Greenville.

3         At least you have a nice bridge to travel on.

4              THE WITNESS:  Yes, ma'am, I do.

5              THE COURT:  That's what we will do, and I don't know

6    what else to do.  And I hope when we are together again that

7    will be it.

8              MR. ROSENZWEIG:  With regard to the deposition, what I

9    would like to do is -- I think probably the easiest thing to do

10   is just give -- start out with giving Mr. Ellis his forum and

11   then start your review on page 72 or 151 or whatever it is with

12   regard to this.  But I think -- you know, since we're doing a

13   deposition without your physical presence, I would like --

14             THE COURT:  Well, I don't think the CJA should pay you

15   to listen to Mr. Ellis unless you are appointed his lawyer.

16             MR. ROSENZWEIG:  Your Honor, what I am trying to do is

17   I am trying to get this necessary information for Mr. Jackson,

18   and Mr. Ellis has it.  And if I have to go through the barbed

19   wire of Mr. Ellis's remarks, I would like to be able to do

20   that.

21             THE COURT:  All right.  Well, I am sure you -- I think

22   that you will do a very good job with Mr. Ellis trying to

23   explain -- you are very experienced, and I have seen you deal

24   effectively with difficult people in the past.  And so I will

25   just let you deal with it as best you know how.  From what I

1    understand, Mr. Ellis is claiming that this Court will -- or

2    does reject all of his pro se IFP lawsuits because of the three

3    strikes and you're out.  And it's probably true.  In other

4    words, he is probably correct, and I can understand his

5    frustration.

6        But in any event, this matter will be continued until a

7    time we can all get together again.  I hope it will be before

8    the end of the calendar year, but I can't promise.

9        MS. RUMPZ:  I have one other thing.  I spoke with

10   Mr. Rosenzweig, and I would like to officially mark and move

11   for the admission the appendix that Dr. Moneypenny reviewed in

12   conjunction with his report as Respondent's Exhibit 16.

13       MR. ROSENZWEIG:  No problem, Your Honor.  I

14   provided -- he testified and I provided it to him for him to

15   review.

16       THE COURT:  All right.  That's fine, and that is of

17   course what the circuit court reviewed in this matter.

18       MR. ROSENZWEIG:  That's correct.

19       MS. RUMPZ:  That's correct.

20   (Respondent's Exhibit 16 received in evidence.)

21       THE COURT:  Thank you.  Court is in recess.

22   (Recess at 5:28 p.m.)

23

24

25

Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

1                    C E R T I F I C A T E

2        I, Cheryl Nelson Kellar, Official Court Reporter, do

3   hereby certify that the foregoing is a true and correct

4   transcript of testimony excerpted from the proceedings held on

5   October 28, 2011.

6

7   /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:  December 8, 2011
        United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25