# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

## *THIS IS A CAPITAL CASE*

ALVIN BERNAL JACKSON                                    PETITIONER

No. 5:03-CV-00405 SWW

LARRY NORRIS, Director,                                    RESPONDENT
Arkansas Department of Correction,

### OPINION and ORDER

Petitioner Alvin Bernal Jackson ("Jackson"), sentenced to death for capital

murder and confined at the Varner Supermax Unit of the Arkansas Department of

Correction ("ADC"), seeks a writ of a habeas corpus pursuant to 28 U.S.C. § 2254,

as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

Following discovery and an evidentiary hearing, by order and judgment entered

March 31, 2016, the Court denied Jackson's remaining claim, that he intellectually

disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S.

304, 122 S. Ct. 2242 (2002).  The Court denied relief under *Atkins* because it found

that Jackson had failed to prove, by a preponderance of the evidence, that he met

each requisite for intellectual disability required under Arkansas law.  Jackson appealed, and the Eighth Circuit Court of Appeals reversed and remanded for consideration of Jackson's *Atkins* claim in view of the Supreme Court's decision in *Moore v. Texas*, 137 S. Ct. 1039 (2017).  After reevaluating Jackson's *Atkins* claim under *Moore,* and according to the specific instructions provided by the Eighth Circuit on remand, the Court finds that Jackson is entitled to relief under *Atkins* and thus orders that the State reduce his sentence to life imprisonment without parole.

## I.  Criteria for Assessing Intellectual Disability under *Atkins*

### A.  The *Atkins* Categorical Rule

With its 1989 decision in *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002), the Supreme Court held that the Eighth Amendment did not mandate a categorical rule banning the death penalty for all intellectually disabled offenders.  At the time, only two States had enacted laws that prohibited such executions, and the consideration of intellectual disability as a mitigating factor allowed jurors to assess the appropriateness of a death sentence in individual cases.  Citing several authorities on intellectual disability, the *Penry* Court observed that while intellectually disabled individuals share common attributes of deficits in intellectual functioning and adaptive behavior, "[intellectually disabled] persons

are individuals whose abilities and experiences can vary greatly." *Penry,* 492 U.S. at 338, 109 S. Ct. 2934, 2957. Writing for the majority, Justice O'Connor stated: "In light of the diverse capacities and life experiences of [intellectually disabled] persons, it cannot be said on the record before us today that all [intellectually disabled] people, by definition, can never act with the level of culpability associated with the death penalty." *Penry,* 492 U.S. at 338–39, 109 S. Ct. at 2957.

In *Atkins v. Virginia*, 536 U.S. 304, 316, 122 S. Ct. 2242 (2002), the Court abrogated *Penry* and held that the execution of intellectually disabled criminals amounted to cruel and unusual punishment, prohibited by the Eighth Amendment. The *Atkins* Court proceeded in two steps.[1] First, the Court considered that during

---

[1] In *Graham v. Florida*, 560 U.S. 48, 60-61, 130 S. Ct. 2011, 2022 (2010), *as modified* (July 6, 2010), the Supreme Court explained that "categorical rules" prohibiting the death penalty are premised on the specific characteristics of the offender. The Court explained the two-step decisional process employed when determining whether a proposed categorical rule properly defines Eighth Amendment standards:

> In the cases adopting categorical rules the Court has taken the following approach. The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue. *Roper v. Simmons,* 543 U.S. 551, 572. 125 S. Ct. 1183 (2005). Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' *Kennedy v. Louisiana*, 554 U.S. 407, 421, 128 S. Ct. 2641, 2650 (2008), the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

*Graham,* 560 U.S. at 61, 130 S. Ct. at 2022.

the thirteen-year period following *Penry,* numerous states, including Arkansas, had enacted laws exempting intellectually disabled offenders from the death penalty. *See Atkins,* 536 U.S. at 314, 122 S. Ct. at 2248. The Court concluded that the recently-enacted statutes amounted to reliable, objective evidence of contemporary values and a national consensus that intellectually disabled defendants were "categorically less culpable than the average criminal." *Atkins,* 536 U.S. at 316, 122 S. Ct. at 2249.

Second, the Court exercised its own independent judgment to decide for itself whether executing a person with intellectual disability violates the Eighth Amendment. The Court looked to clinical definitions of intellectual disability, which "require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins v. Virginia*, 536 U.S. at 318, 122 S. Ct. at 2250. The Court also considered that because of their impairments, intellectually disabled persons "by definition have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins,* 536 U.S. at 318, 122 S. Ct. at 2250.

The Court added: "There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." *Id.*

Writing for the majority, Justice Stevens provided two justifications for a categorical rule forbidding the execution of intellectually disabled capital defendants: One, the above-mentioned characteristics of intellectually disabled people diminish personal culpability to such an extent that a death sentence would betray the penological goals of deterrence and retribution. *Atkins*, 536 U.S. at 319-20, 122 S. Ct. at 2250-51. Two, the "reduced capacity" of intellectually disabled offenders presents a risk "that the death penalty will be wrongly imposed [despite] factors that may call for a less severe penalty." *Atkins,* 536 U.S. at 321, 122 S. Ct. at 2252. Relevant to the second justification, Justice Stevens reasoned that intellectually disabled defendants are less able to make a persuasive showing of mitigation because they "may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.*

The *Atkins* Court concluded: "Our independent evaluation of the issue reveals no reason to disagree with the judgment of 'the legislatures that have

recently addressed the matter' and concluded that death is not a suitable punishment for [an intellectually disabled] criminal." *Id.*

## B. Arkansas Code § 5-4-618 and Clinical Criteria for Intellectual Disability

Arkansas Code § 5-4-618, enacted before *Atkins*, provides: "No defendant with [intellectual disability] at the time of committing capital murder shall be sentenced to death." Ark. Code. Ann. § 5-4-618(b). Arkansas law requires that a defendant show intellectual disability by proving four factors by the preponderance of the evidence:

1. "Significantly subaverage general intellectual functioning";

2. "[A] significant deficit or impairment in adaptive functioning";

3. That both . . . above "manifest[ed] ... no later than age eighteen"; and

4. "A deficit in adaptive behavior."

*Sasser v. Hobbs*, 735 F.3d 833, 843 (8th Cir. 2013)(quoting Ark. Code Ann. § 5–4–618(a)). Arkansas's four-pong test is consistent with clinical diagnostic criteria for intellectual disability prescribed by the American Psychiatric Association ("APA") in the *Diagnostic and Statistical Manual of Mental Disorders,* 33 (5th ed. 2013) ("DSM-5"). DSM-5 sets forth three requisites for intellectual disability, labeled Criterion A, B, and C, that match Arkansas Code §5-4-618(a) prongs 1 through 3 above.

Criterion A requires deficits in intellectual functions, "such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by *both clinical assessment and individualized, standardized intelligence testing*." DSM-5, at 33(emphasis added). "Intellectual functioning is typically measured with individually administered and psychometrically valid . . . tests of intelligence[,]" and a person with intellectual disability has an intelligence quotient ("IQ") score of approximately two standard deviations or more below the population mean. *See id.* For a standardized intelligence test with a standard deviation of 15 and a mean of 100, an IQ score of 70 marks the point two standard deviations below the mean, and if the specific test administered has a standard error of measurement ("SEM") of plus or minus five points, intellectual disability would involve an IQ score range of 65–75.[2] *See id*.

DSM-5 lists factors that might invalidate an IQ score, including practice effects, the "'Flynn effect'(*i.e*., overly high scores due to due to out-of-date test norms)[,]" *id*., and highly discrepant subtest scores. DSM-5 recognizes that IQ scores "are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks" and that

_____

[2]The DSM-5 places a major focus on adaptive behavior and parts with the practice of categorizing levels of intellectual disability based on IQ score "because it is adaptive functioning that determines the level of support required" and "IQ measures are less valid in the lower end of the IQ range." DSM-5, at 33.

"*clinical judgment is needed in interpreting the results of IQ tests*." *Id*. (emphasis added).

Criterion B requires deficits in adaptive functioning "that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility." *Id*. Criterion B "is met when at least one domain of adaptive functioning--conceptual, social, or practical--is sufficiently impaired that ongoing support is needed for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-5, at 38. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. DSM-5, 37.

The APA prescribes that a clinician should assess adaptive functioning using both clinical evaluation and standardized measures with knowledgeable informants, such as family members. *See* DSM-5, at 37. "Additional sources of

information include educational, developmental, medical, and mental health evaluations." *Id*. Unlike previous versions of the APA's diagnostic manual, the DSM-5 provides: "To meet the diagnostic criteria for intellectual disability, the deficits in adaptive behavior must be directly related to intellectual impairments described in Criterion A [deficits in intellectual functioning]." DSM-5, at 38. Particularly relevant to *Atkins* claims, the DSM-5 provides: "Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained." *Id*.

Criterion C requires that the onset of the intellectual and adaptive deficits occurred during the developmental period, before the defendant's eighteenth birthday. Finally, the fourth prong of the Arkansas statute, which has no counterpart under DSM-5, requires a deficit in adaptive behavior, which is equivalent to adaptive functioning, with no reference to the time of onset. *See Jackson* v. Norris, 615 F.3d 959, 967 )(8th Cir. 2010)(discussing *Miller v. State,* 2010 Ark. 1, 362 S.W.3d 264 (2010)).

### C. Evolving Supreme Court Precedent Regarding Review of *Atkins* Claims

#### 1. *Hall v. Florida*

The *Atkins* Court noted that the States' various statutory definitions of intellectual disability were "not identical, but generally conform[ed] to the clinical

definitions . . . . " *Atkins,* 536 U.S. at 317, and n.22, 122 S. Ct. at 2250. The Court also acknowledged that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus" and that "[t]o the extent there is serious disagreement about the execution of [intellectually disabled] offenders, it is in determining which offenders are in fact [intellectually disabled]. *Atkins,* 536 U.S. at 317, 122 S. Ct. at 2250. Despite these observations, the *Atkins* Court offered no guidance as to how lawmakers and courts would implement the *Atkins* rule and purposely left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Atkins,* 536 U.S. at 315, 16, 112 S. Ct. at 2249(citing *Ford v. Wainright*, 477 U.S. at 405, 416-417, 106 S. Ct. 2595 (1986)).

Post *Atkins*, the Florida Supreme Court interpreted the state's statutory definition of intellectual disability to require a threshold showing of an IQ score of 70 or below, without consideration of a margin for error. *Cherry v. State*, 959 So. 2d 702, 712-713 (Fla. 2007), *abrogated by Hall v. Florida.*, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014). Florida's rule foreclosed exploration of a capital defendant's adaptive functioning or other evidence of intellectual deficiencies even if, accounting for the SEM applicable to an IQ test, the defendant's IQ score fell within a range that included scores at or below 70.

In *Hall v. Florida,* the Supreme Court held that Florida's strict IQ cutoff "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Hall v. Fla.*, 572 U.S. 701, 704, 134 S. Ct. 1986, 1990 (2014). Writing for the majority, Justice Kennedy explained that Florida's rigid decisional rule disregarded a consensus among professionals that "[t]he SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score . . . [and] allows clinicians to calculate a range within which one may say an individual's true IQ score lies." *Hall,* 572 U.S. at 713, 134 S. Ct. at 1995. Justice Kennedy further noted that Florida's cutoff contravened clinical standards by precluding an assessment of adaptive functioning even in cases where application of the SEM produces an IQ score range or confidence interval that includes scores of 70 or below. *Hall,* 572 U.S. at 714, 134 S. Ct. at 1996. As DSM-5 advises, "a person with an IQ score of above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score." DSM-5, at 37.

Each version of a standardized intelligence test has a unique SEM, calculated according to data regarding the specific test's reliability. A test's unique SEM is used to construct a confidence interval, or range of scores around the reported or observed score, to any degree of certainty. In his dissent in *Hall*,

Justice Alito detailed the relationship between a test's unique SEM and related

confidence intervals:

> Once we know the SEM for a particular test and a particular test-taker, adding *one* SEM to and subtracting *one* SEM from the obtained score establishes an interval of scores known as the [68%][3] confidence interval. That interval represents the range of scores within which "we are [68%] sure" that the "true" IQ falls. The interval is centered on the obtained score, and it includes scores that are above and below that score by the amount of the SEM. Since there is about a [68%] chance that the test-taker's "true" IQ falls within this range, there is about a 32% chance that the 'true' IQ falls outside the interval, with approximately equal odds that it falls above the interval [16%] or below the interval [16%].

> An example: If a test-taker scores a 72 on an IQ test with a SEM of 2, the [68%] confidence interval is the range of 70 to 74 (72 ± 2). In this situation, there is approximately a [68%] chance that the test-taker's "true" IQ is between 70 and 74; roughly a [16%] chance that it is above 74; and roughly a [16%] chance that it is 70 or below. Thus, there is about an [84%] chance that the score is above 70.

> Similarly, using *two* SEMs, we can build a 95% confidence interval. The process is the same except that we add two SEMs to and subtract two SEMs from the obtained score. To illustrate the use of two SEMs, let us hypothesize a case in which the defendant's obtained score is 74. With the same SEM of 2 as in the prior example, there would be a 95% chance that the true score is between 70 and 78 (74 ± 4); roughly a 2.5% chance that the score is above 78; and about a 2.5% chance that the score is 70 or below. The probability of a true score above 70 would be roughly 97.5%. As these two examples show, the greater the degree of confidence demanded, the greater the range of scores that will fall within the confidence interval and, therefore, the further away from 70

---

[3]As noted in *United States v. Wilson*, 170 F. Supp. 3d 347, 354 (E.D.N.Y. 2016), the actual text of Justice Alito's dissent refers to a "66% confidence interval" due to a misprint in a 2010 manual by the American Association on Intellectual and Developmental Disabilities.

> an obtained score could be and yet still have 70 fall within its
> confidence interval.

*Hall,* 572 U.S. at 738–39, 134 S. Ct. at 2010 (Alito, J., dissenting)(internal

citations omitted).  Justice Alito opined that where state law requires a defendant to

prove intellectual disability by a preponderance of the evidence, which is the case

in Arkansas, employing a 68% or 95% confidence interval effectively transforms

the burden of proof and allows a defendant to prove significantly subaverage

intellectual functioning "by showing simply that the probability of a 'true' IQ of 70

or below is as little as [16%] (under a one-SEM rule) or 2.5% (under a two-SEM

rule)." *Hall,* 572 U.S. at 741, 134 S. Ct. at 2011(Alito, J., dissenting).

The *Hall* Court recognized that every IQ test has a distinct SEM.  *See Hall,*

572 U.S. 701, 713–14, 134 S. Ct. 1986, 1995 (2014)(quoting Brief for American

Psychological Association *et al*. as *Amici Curiae*, 2013 WL 6805688, at \*23)("For

example, the average SEM for the WAIS–IV is 2.16 IQ test points[,] and the

average SEM for the Stanford-Binet 5 is 2.30 IQ test points . . . .").  But the Court

provided mixed signals as to whether lower courts should employ a test-specific

SEM, which is normally less than half of the "general" five-point SEM mentioned

in DSM-5, or simply apply an across-the-board, five-point SEM.  On one hand, the

Court referenced its "independent assessment" that "an individual with an IQ test

score 'between 70 and 75 or lower' may show intellectual disability by presenting

additional evidence regarding difficulties in adaptive functioning," *Hall,* 572 U.S.

at 722, 134 S. Ct. at 2000(quoting *Atkins, 536 U.S.* at 309, n. 5, 122 S. Ct. 2242),

indicating that the Court endorsed a blanket, five-point SEM.  On the other hand,

the Court stated its agreement "with the medical experts that when a defendant's IQ

test score falls within the test's *acknowledged and inherent margin of error*, the

defendant must be able to present additional evidence of intellectual disability,

including testimony regarding adaptive deficits."  *Hall,* 572 U.S. at 723, 134 S. Ct.

at 2001(emphasis added).  In his dissent, Justice Alito noted that if lower courts

applied a five-point SEM in all cases, even when the known, statistically correct

SEM is less than 2.5, it would involve applying more than two SEMs, resulting in

a 98% confidence interval.  *Hall,* 572 U.S. at 740, 134 S. Ct. at 2011 (Alito, J.,

dissenting).[4]

---

[4]In remanding this case, the Eighth Circuit specified that for *Atkins* purposes, "the standard error of measurement ["SEM"] is plus or minus 5 points," *Jackson v. Kelley*, 898 F.3d 859, 864 (8th Cir. 2018), and this Court is required to follow that instruction. At the same time, the dissent in *Hall* demonstrates that adoption of a comprehensive five-point SEM, when the test-specific SEM is less than five, decreases the precision of the data and lessens a petitioner's burden of proof.  At least one other district court has made a similar observation.  In *United States v. Wilson*, 170 F. Supp. 3d 347 (E.D.N.Y. 2016), the court rejected the idea that *Hall* requires lower courts to apply a five-point SEM in all cases because doing so would ignore the fact, observed in *Hall*, that every IQ test has a unique, data-based SEM.  *Wilson*, 170 F. Supp. 3d at 364.  The district court further noted: "In situations where a given test's SEM is greater than five, a blanket cutoff at 75 [*i.e.*, a five-point SEM] would run afoul of *Hall's* requirement to apply the SEM."  *Id*.  In *Wilson*, the district court reasoned that the critical question was whether *Hall* prescribes a 68% or 95% confidence interval.  *Id*.  After considering the options, the district court determined that by indicating that the margin of error was *generally* plus or minus five points, "the Supreme Court all but explicitly stated that lower courts should employ two SEMs [a 95% confidence interval] in conducting this analysis."  *Wilson,* 170 F. Supp. 3d at 365.

## 2. *Moore v. Texas*

In *Moore v. Texas* ("*Moore I*"), 137 S. Ct. 1039 (2017), handed down after this Court denied Jackson's remaining claim, the Supreme Court provided additional guidance on the proper assessment of *Atkins* claims. In that case, the Texas Court of Criminal Appeals ("CCA") had rejected a state habeas court's finding that death row inmate Bobby James Moore ("Moore") was intellectually disabled. *See Ex parte Moore ("Ex parte Moore I")*, 470 S.W.3d 481, 527 (Tex. Crim. App. 2015), *vacated and remanded sub nom. Moore v. Texas*, 137 S. Ct. 1039 (2017). The Supreme Court granted certiorari, found that the CCA had strayed from prevailing clinical standards in assessing Moore's claim, and remanded the case for further proceedings.[5]

In evaluating evidence of Moore's intellectual functioning, the CCA considered two IQ scores: 78, obtained when Moore was thirteen, and 74, obtained after he had arrived on death row. *Ex parte Moore I,* 470 S.W.3d at 518–19. Apparently applying an across-the-board, 5-point SEM, the CCA determined that

---

[5]Not particularly relevant here, in *Moore I*, the Supreme Court also struck down Texas's standard for assessing intellectual disability set forth in *Ex parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004). *Briseno* required courts to consider seven evidentiary factors, known as the *Briseno* factors, in assessing whether adaptive deficits are related to intellectual functioning deficits. In *Moore I*, the Supreme Court held that the *Briseno* factors had no alignment to clinical standards and created an unacceptable risk that persons with intellectual disability would be executed. *Moore v. Texas*, 137 S. Ct. 1039, 1044 (2017).

the score range for the observed 78 IQ score was 73 to 83, and the score range for the observed 74 IQ score was 69 to 79. The CCA recognized that both ranges encompassed the zone for significantly subaverage intellectual functioning. However, the CCA also considered expert testimony that Moore's IQ scores were artificially low due to depression and/or suboptimal effort, and the CCA ultimately found "no reason to doubt" that Moore's observed IQ scores of 78 and 73 fairly represented his intellectual functioning and were above the range for intellectual disability.

Despite finding that Moore failed to prove significantly subaverage intellectual functioning, the CCA proceeded to assess Moore's adaptive functioning, and it concluded that he failed to show significant limitations that were related to his intellectual deficiencies. Among other things, the CCA noted that in the open community, Moore made money by mowing lawns and playing pool, and in prison, he functioned well and learned to read and write. The CCA found: "The significant advances applicant has demonstrated while confined on death row further support the conclusion that his academic and social difficulties were not related to significantly sub-average general intellectual functioning." *Ex parte Moore I*, 470 S.W.3d at 526.

The Supreme Court criticized the CCA's analysis as irreconcilable with *Hall*, reasoning that the Texas court had disregarded the lower end of the range of

scores for Moore's observed 74 IQ score obtained during his incarceration on death row.  The Supreme Court instructed that "the presence of other sources of imprecision in administering the test to a particular individual cannot *narrow* the test-specific standard-error range."  *Moore I,* 137 S. Ct. at 1049-1050.   Despite the experts' clinical observations, because the lower end of Moore's score range fell at or below 70, the *Moore* Court found that the CCA was bound to continue its inquiry and consider Moore's adaptive functioning.  *Id.*

The Supreme Court also faulted the CCA's assessment of Moore's adaptive functioning, finding that it had departed from clinical standards in multiple ways by overemphasizing evidence of Moore's adaptive strengths; stressing adaptive strengths that Moore developed in prison, a controlled setting; concluding that Moore's history of academic failure, abuse, and suffering detracted from a determination that his intellectual and adaptive deficits were related; and requiring Moore to show that his adaptive strengths were not related to a personality disorder.  *Moore I*, 137 S. Ct. at 1050-1051.  In reaching its decision, the Court referred to then-current publications, including DMS-5, and stated that "the medical community's current standards supply one constraint" on the States' flexibility in enforcing *Atkins*' holding."  *Moore I,*  137 S. Ct. 1039, 1052–53 (2017).

On remand, the CCA adopted DSM-5's criteria for intellectual disability and concluded once again that Moore had not demonstrated intellectual disability. *Ex parte Moore ("Ex parte Moore II")*, 548 S.W.3d 552 (2018). In reaching its decision, the CCA credited testimony by the State's expert, who also followed the DSM-5 framework and found that Moore's level of adaptive functioning, both before and after entering prison, was too great to support a diagnosis of intellectual disability. Although Moore had deficits in reading, writing, and math in his youth, the CCA considered evidence including Moore's *pro se* filings and prison commissary records and found that as an adult, he had progressed to the point where he could read and write on a seventh-grade level and had command of basic math skills. The CCA recognized DSM-5's caution that it may be difficult to assess adaptive functioning in a controlled environment, such as prison, but it found that "the amount and pace of [Moore's] improvement . . . is simply inconsistent with the habeas court's description of [Moore] as a 'slow learner.'" *Ex parte Moore II*, 548 S.W.3d at 569.

The Supreme Court granted certiorari, reversed the CCA a second time, and found for itself that Moore had established intellectual disability. *Moore v. Texas ("Moore II")*, 139 S. Ct. 666, 670 (2019). In *Moore II*, the Supreme Court repeated evidence that it had described in *Moore I* regarding Moore's adaptive deficits in childhood, including the lack of a basic understanding of the days of the

week, months of the year, and seasons, an inability to tell time and comprehend

basic math concepts, and limited reading skills, *Moore II*, 139 S. Ct. at 667-668,

and it found that the CCA had once again overemphasized Moore's apparent

adaptive strengths and relied too heavily upon adaptive improvements made in

prison. *Moore II*, 139 S. Ct. at 670-671.

## II. Jackson's Case

### A. Factual and Procedural Background

Jackson and his twin brother Calvin Jackson ("Calvin") were born June 30,

1970. As a child, Jackson exhibited serious behavior problems, which persisted

throughout his grade-school years. In contrast to Calvin, Jackson made little

academic progress, and he could not function in a regular classroom. Records

from Jackson's youth show that he had a language disorder, attention deficit

hyperactivity disorder ("ADHD"), which went largely untreated, and a possible

brain disorder.

When Jackson was nineteen, he directed his cousin to lure a man out of a

commercial building that was closed for the day. Jackson guessed that the man,

Charles Colclasure, was a security guard, and he planned to take money from him.

Colclasure came outside, Jackson demanded his wallet, and Colclasure ran.

Jackson chased Colclasure on foot and shot him several times with a pellet gun,

and he directed his cousin to join the chase using Colclasure's car. The cousin

struck Colclasure with the vehicle, immobilizing him, and Jackson then drove Colclasure, who was subdued but alive, to the Arkansas River. Jackson and his cousin pushed Colclasure into the river, and Jackson later surmised that Colclasure "just drowned" because he didn't have enough energy to breathe. The next day, Colclasure's dead body, covered with wounds from rat shot, was recovered from the river.

Six years later, while serving a life sentence for Colclasure's capital murder, Jackson escaped his prison cell and stabbed to death ADC Sergeant Scott Grimes. Jackson committed the murder with a shank that he had handcrafted in his prison cell, and his intended victim was another inmate who was Jackson's enemy. Jackson had prepared for the attack by removing a piece of metal from his cell door, which would allow him to kick the bottom of the door open during the short window of time when the target of his attack plan would pass by, escorted by Sergeant Grimes. At the opportune moment, Jackson kicked open his cell door and ran toward his enemy, intending to stab him, but he missed and stabbed Sergeant Grimes, who was shielding the inmate's body. In 1996, a jury found Jackson guilty of the capital murder of Sergeant Grimes and imposed a death sentence.

In 2003, Jackson commenced this habeas action, and the sole remaining claim is that he is intellectually disabled and thus exempt from the death penalty under *Atkins.* Three times, the Court has denied habeas relief under *Atkins*, and

three times, the Eighth Circuit has reversed and remanded.  Most recently, this Court denied Jackson's *Atkins* claim after considering evidence presented during a two-day evidentiary hearing and finding that Jackson failed to show, by a preponderance of the evidence, that he meets each requirement for intellectual disability required under Arkansas law.

### B.  Overall Expert Opinions

In finding that Jackson had failed to meet his burden of proof, the Court considered, among other evidence, expert testimony from Dr. James Moneypenny, a clinical psychologist retained by Jackson, and Dr. Gilbert S. Macvaugh, III, a clinical and forensic psychologist retained by the State.  Dr. Moneypenny opined that Jackson met the criteria for intellectual disability, but for reasons detailed in its order denying Jackson's claim, the Court found Dr. Moneypenny's opinion unreliable.

Dr. Macvaugh provided his "clinical" opinion that Jackson did not qualify as intellectually disabled, and he formed that opinion after reviewing extensive information about Jackson's history, conducting in-person clinical interviews with Jackson, interviewing Jackson's brother Calvin, and administering psychological tests over the course of two days.[6]  Notwithstanding Dr. Macvaugh's "clinical"

---

[6]Dr. Macvaugh described his in-depth investigation and set forth his opinions in a written report.  *See* Resp't *Atkins* Hr'g Ex. #6.

assessment that Jackson is not intellectually disabled, he could not provide a

"forensic" opinion, within a reasonable degree of psychological certainty, whether

Jackson was intellectually disabled.  Dr. Macvaugh explained the difference a

"clinical" opinion and a "forensic" opinion:

> A clinical opinion is an opinion based on assessment of relevant
> information outside the medical/legal context and the standards are not
> as rigorous as they are in a forensic context.  So in a clinical setting
> where a person may present for treatment, for example, one may be able
> to arrive at a clinical opinion about the person's diagnosis, et cetera.
> But in a forensic setting, a forensic evaluation, the standards are much,
> much higher, in part because mental health professionals, forensic
> psychologists like [me] are working to assist the fact-finder in making
> a legal finding about some psycho-legal issue.  And in this case, it's
> very difficult to offer an opinion to a reasonable degree of certainty that
> he does not have [intellectual disability].[7]

Dr. Macvaugh listed several factors that prevented him forming a forensic opinion

in Jackson's case:  difficulties in measuring Jackson's intellectual functioning and

adaptive behavior, his opinion that Jackson appeared to malinger cognitive deficits,

and the substantial time, approximately twenty-three years, that had passed from

the requisite age of manifestation, eighteen or younger, and Dr. Macvaugh's

evaluation.[8]

Dr. Macvaugh reaffirmed his clinical assessment on cross-examination and

restated that he could not rule out, to a reasonable degree of psychological

---

[7]ECF No. 112, at 10.
[8]ECF No. 112, at 266.

certainty, that Jackson was *not* intellectually disabled.  He added:  "It may be helpful for me to rephrase it this way.  If he has [intellectual disability], it's not by much.  If he doesn't have it, it's not by much."[9]  Directly addressing this Court, Dr. Macvaugh explained:

> Clinically, I don't think he has it. Clinically, I think he is squarely in the mid borderline of intelligence, and he has other issues.  His brain is not right, Judge.  This man does have intellectual problems, but I don't think that, based on the information that I had, that his intellectual functioning was so low that he would qualify for that diagnosis.  But, again, I cannot testify to a reasonable degree of certainty that he does not have it because the consequences of my mistakes would be great. And because of the threats to the data and the validity of the information, it just would be intellectually dishonest for me to state an opinion forensically that he does not have it when I would not be confident in that opinion.[10]

### B.  Evidence of Jackson's Intellectual Functioning

In assessing intellectual functioning, Drs. Moneypenny and Macvaugh evaluated Jackson separately in 2011, and each clinician separately administered the Wechsler Adult Intelligence Scale, fourth edition ("WAIS-IV").  Dr. Macvaugh obtained a full-scale IQ score of 50, and Dr. Moneypenny obtained a full-scale IQ score of 56.  Dr. Macvaugh provided detailed testimony explaining that the 50-point IQ score he obtained was not valid because Jackson grossly malingered intellectual deficits during testing.  Dr. Moneypenny failed to assess for

---

[9]ECF No. 112, at 295.
[10]ECF No. 112, at 267-68.

malingering, and he could not rule out that Jackson feigned intellectual deficits during the test that he administered.  Crediting Dr. Macvaugh's testimony, the Court found that Jackson's 2011 IQ scores were not reliable evidence of his true intellectual functioning.

The doctors also reviewed testimony and exhibits from Jackson's state court criminal proceedings, which provided limited information about intelligence tests administered to Jackson in the context of special education and mental health services that he received as a child:

- When Jackson was six, an unknown examiner administered an unspecified version of the Stanford Binet Intelligence Test, and Jackson obtained an overall IQ score of 72.  The subtest results are not known.

- When Jackson was seven, Dr. Bill Johnson, a psychologist, administered the Wechsler Intelligence Scale for Children, Revised, and Jackson received a full-scale IQ score of 73, a performance subtest score of 90, and a verbal subtest score of 60.  Dr. Johnson noted that the 30-point divergence between Jackson's verbal and performance scores indicated that the reported 73-point, full-scale IQ score was not reliable.

- When Jackson was eleven, an unknown examiner administered an unknown version of the Wechsler Intelligence Scale for Children.  Jackson obtained a verbal subtest score of 72, a performance subtest score of 95, and a full-scale IQ of 81.  Again, the examiner noted a 30-point difference between Jackson's performance and verbal subtest scores.

- When Jackson was 16, an unknown examiner administered an unknown version of the Wechsler Intelligence Scale for Children.  Jackson obtained a verbal subtest score of 62, a performance subtest score of 91, and a full-scale IQ score of 74.  Again, the examiner noted a significant gap between Jackson's verbal and performance subtest scores.

Dr. Macvaugh noted several threats to the psychometric validity of the IQ scores from Jackson's youth, including the substantial gap between Jackson's verbal and performance subtest scores. Referring to the test administered by Dr. Johnson, when Jackson was seven years old, Dr. Macvaugh explained:

> And at that time[,] his overall IQ score was 73, again classified in the borderline range. And what's notable about that set of scores is that -- and maybe I should back up. In previous editions of these intelligence tests, there was a different breakdown in terms of the structure of the scores. Before the current instrument that we use [now], the scores were reported as three different IQ scores -- verbal IQ, performance or nonverbal IQ, and the full-scale overall IQ.
>
> So back when Dr. Johnson administered the Wechsler Intelligence Scale for Children, Revised, on the verbal IQ, Mr. Jackson obtained an IQ score of 60, which is in the range of mild mental retardation. However, his performance or non-verbal IQ was a 90, which is average. Therefore, his full-scale IQ, although it is 73 and technically in the borderline range, is not all that meaningful because there is such a significant disparity between his verbal and performance IQ scores, which means that overall full-scale IQ is probably not a very reliable measure of his overall intellectual functioning. It's somewhat skewed.[11]

Dr. Macvaugh's observation is consistent with the DSM-5, which states that "highly discrepant individual test score may make an overall IQ score invalid." DSM-5, at 37. Contrary to DSM-5 standards for diagnosing intellectual disability, Dr. Moneypenny opined that Jackson's significantly lower verbal subtest scores were meaningful indicators of his intellectual functioning. ECF No. 111, at 14.

---

[11]ECF No. 111, at 230-31.

Dr. Macvaugh further explained that the lack of raw test data and information about the specific versions of IQ tests administered to Jackson prevented him from confirming the validity of the reported scores[12] or accounting for the Flynn effect, which usually results in a retroactive reduction of previous IQ scores.[13] Notwithstanding the presence of factors that would otherwise affect the validity of Jackson's early scores, Dr. Macvaugh found that the administration of multiple, varied tests that produced similar scores lessened concerns about

---

[12]Dr. Macvaugh testified:

> I couldn't determine, based on all these previous administrations, exactly what version of the test was administered. Many of them I learned about through reading the testimony at the sentencing phase of his capital murder trial. They weren't . . . specific about dates or which version, and I don't have a whole lot of confidence in all these administrations being done by a licensed psychologist who was trained to administer intelligence tests. I couldn't confirm the raw data in other words.

ECF 111, at 24. In his forensic report, Dr. Macvaugh noted: "[N]one of the raw test data regarding any of Mr. Jackson's previous intellectual assessments were available for review. As such, the validity of those prior scores could not be confirmed." Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 57).

[13]ECF No. 111, at 244-246. "The Flynn effect acknowledges that as an intelligence test . . . moves farther from the date on which it was standardized, or normed, the mean score of the population . . . on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field." *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010).

psychometric validity and revealed a pattern that suggested Jackson "is above the cut" for intellectual disability.[14]  He testified:

> He is squarely in the low to mid borderline range, and when we consider . . . the test error of plus or minus five points -- at a certain point, when you have repeated administrations of multiple different tests that have roughly the same conclusion, you have less concern about the error in those scores because the error conceptually is what we use to describe the possibility that one score might not be correct, but when you have lots of scores that all fall in the same approximate area or range, then there is probably less error associated with each of those scores because we have evidence of consistency across multiple administrations."[15]

Stressing his view that more data leads to less error, Dr. Macvaugh cited additional observations that contributed to his "clinical" assessment that Jackson's intellectual functioning fell within the low to mid-borderline range.  He recounted that when he met Jackson in 2011, he was vigilant in protecting his rights and reluctant to sign a confidentiality/notice of rights form, and he asked questions that

---

[14]ECF No. 111, at 242.  Dr. Macvaugh's approach is consistent with an observation by the dissenters in *Hall* that "the well-accepted view is that multiple consistent scores establish a much higher degree of confidence [than a single IQ score].  *Hall v. Fla.*, 572 U.S. 701, 742,  134 S. Ct. 1986, 2011 (2014)(Alito, J., dissenting)(citations omitted).  In a footnote, Justice Alito added:  "When there are multiple scores, moreover, there is good reason to treat low scores differently from high scores: 'Although one cannot do better on an IQ test than one is capable of doing, one can certainly do worse.'"  *Hall,*  572 U.S. at 742 n.13, 134 S. Ct. at 2011 n.13(Alito, J., dissenting)(quoting Forensic Psychology and Neuropsychology for Criminal and Civil Cases 56 (H. Hall ed. 2008)).

[15]*Id.*  In his written report, Dr. Macvaugh summarized:  "These psychometric limitations notwithstanding, it is my clinical impression that Mr. Jackson is functioning between the low to mid borderline range of intelligence; and this conclusion is based on the totality of the data available, as opposed to any single source of information, test score, etc."  *See* Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 5-6).

indicated he understood the content of the form.  Dr. Macvaugh testified that in his experience, "persons who have genuine [intellectual disability] are not capable of asking those questions because they don't understand the content as well as he appeared to."[16]  Dr. Macvaugh also observed that Jackson's vocabulary was inconsistent with intellectual disability and that he understood and could estimate measurement and distance, which is often lacking in people with mild intellectual disability.  Dr. Macvaugh listened to recordings of Jackson's prison telephone conversations and opined that the content suggested "intellectual capacities much higher" than indicated by the results of his 2011 IQ tests.  On the other hand, he found it telling that Jackson did not appear to appreciate that he was possibly being monitored during the conversations, despite a clear automated warning that at the beginning of each call, warning that the calls "may be" monitored.

### C.  Evidence of Jackson's Adaptive Functioning

Dr. Macvaugh explicitly declined to provide an opinion, clinical or forensic, as to whether Jackson has adaptive functioning deficits that meet the standard for intellectual disability.  According to Dr. Macvaugh, determining whether Jackson demonstrated significant deficits in adaptive behavior prior to age eighteen was even more challenging than assessing his intellectual functioning.  First, Jackson had lived his entire adult life in prison, and no parent or previous caretaker was

---

[16]ECF No. 112, at 15.

available to provide retrospective information about his adaptive behaviors outside

of prison.   Dr. Macvaugh interviewed Calvin but found that he was an

inappropriate source of information because he did not serve as Jackson's caretaker

and could provide only limited information based on what he remembered from his

early childhood.  Second, Dr. Macvaugh opined that traditional tests used for

assessing adaptive functioning were not appropriate in Jackson's case.  In his

written report, he explained that such tests assess adaptive functioning in the open

community and were not developed for use with incarcerated populations, "and the

retrospective use of these instruments to measure adaptive behavior prior to age

eighteen for those who have been incarcerated an extended period of time remains

of topic of controversy in the field."[17]

Although Dr. Macvaugh found that Jackson's circumstances prevented a

valid, retrospective analysis of his adaptive functioning,[18] he acknowledged that

documentary evidence showed that Jackson had adaptive deficits during his

childhood in several areas, including functional academic skills,

---

[17]Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 49).

[18]Dr. Macvaugh reported that "because Mr. Jackson has been incarcerated for nearly all of his adult life (and also during a portion of his adolescent years), any retrospective assessment of his adaptive deficits prior to age eighteen is likely to be of questionable validity and plagued by measurement error."  Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 59).

social/interpersonal skills, communication, and self-direction.[19]  However, Dr.

Macvaugh was unable to determine whether these deficits were due to intellectual

disability, Jackson's untreated ADHD, or other disorders that were either

diagnosed or suspected during Jackson's youth, which included a conduct disorder,

polysubstance abuse, unspecified encephalopathy or degeneration of the brain, and

a verbal learning and/or communication disorder.  As stated in the Court's prior

decision, Dr. Macvaugh expressly recognized that the presence of comorbid

conditions did not preclude intellectual disability, but he found that they made a

differential diagnosis extraordinarily difficult.[20]  He recognized that some

clinicians think that "if the deficits are present, that's all that matters"[21] but that he

believed it necessary to determine the etiology of an adaptive deficit rather than

considering the deficit a necessary consequence of intellectual impairments.

 Dr. Moneypenny testified that Jackson has "significant deficits pretty much

across the board."[22]  He assessed Jackson's adaptive functioning based on the

results of a test he administered, the Adaptive Behavior Assessment, Second

Edition (ABAS-II), using Calvin as the informer or rater.  The ABAS-II required

---

[19] Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 58).

[20] See Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 59).

[21] ECF No. 112, at 45.

[22] ECF No. 111, at 25.

that Calvin rate whether or how well his brother correctly performed various behaviors without help. Dr. Moneypenny reported that the test results reflected significant deficiencies in adaptive functioning in virtually all skill areas, but he failed to provide specific information about the test results. Dr. Macvaugh viewed the ABAS-II as a highly inappropriate assessment tool because it is designed to assess current functioning, and this case requires a retrospective assessment of Jackson's adaptive functioning before he entered prison.

Calvin testified that he lived with Jackson during childhood and recalled that his twin was "slower" than he and had difficulty understanding things and following instructions. Calvin remembered that Jackson would become frustrated and break toys and that other children teased him. He also confirmed that Jackson had behavior problems in school and was placed in special classes. Calvin testified that teachers would call upon him to encourage his brother to behave. Additionally, Jackson had speech problems, and Calvin would often serve as an interpreter and tell others what Jackson was saying.

Evidence about Jackson's adaptive functioning in adolescence included that he held two menial-labor jobs before his incarceration and that he drove and stole cars. Drs. Macvaugh and Moneypenny both testified that Jackson's functioning in prison could not serve as a valid index of his functioning in a noncontrolled setting before the age of eighteen, but they agreed that such information should be

considered. Evidence about Jackson's institutional adaptation included that he has filed *pro se* lawsuits and grievances and understood and utilized a complex method to send written correspondence to other prisoners. Furthermore, this Court notes that he was in prison when planned and committed the murder for which he was sentenced to death.

### D. This Court's Prior Decision and Reasoning

In evaluating the evidence, the Court found the testimony of Jackson's expert witness, Dr. Moneypenny, entirely unhelpful. Dr. Moneypenny failed to adequately assess for malingering when he administered the WAIS-IV to Jackson in 2011; he opined, contrary to DSM-5 standards, that Jackson's low verbal subtest results from prior testing was a meaningful indicator of his overall intellectual functioning; and he gauged Jackson's adaptive behavior with a test designed to assess a person's adaptive functioning in the open community, not correctional populations. The Court found Dr. Macvaugh's investigation thorough and thoughtful, but inconclusive. The Court clearly understood that despite his "clinical" opinion that Jackson is "above the cut" for intellectual disability, Dr. Macvaugh could not state to a reasonable degree of psychological or medical certainty whether Jackson meets the criteria for intellectual disability.

Given the Court's assessment of Dr. Moneypenny's testimony, and despite Dr. Macvaugh's inability to rule out intellectual disability to a forensic certainty,

the Court found that Jackson had failed to meet his burden of proof to show, by a preponderance of the evidence, the first two criteria for intellectual disability: significantly subaverage general intellectual functioning and a significant deficit or impairment in adaptive functioning.[23] The Court did not find that Jackson *is not* intellectually disabled, explaining:

> The resolution of Jackson's claim . . . does not rest on whether the Court finds, by a scientific or forensic certainty, that he *is not* intellectually disabled. The question for the Court is whether Jackson has proved, by a preponderance of the evidence, that he meets each requisite for intellectual disability under Arkansas law, and the Court finds that he has not.

In the interest of providing a complete record, the Court went on to find that Jackson met the third prong under § 5-4-618(a), Criterion C under DSM-5, because regardless of the severity of Jackson's intellectual and adaptive deficits, it was undisputed that the onset of his deficits occurred during the developmental period. The fourth prong under § 5-4-618(a), which has no counterpart under DSM-5, requires a deficit in adaptive behavior without regard to the date of onset. Because

---

[23]In reversing the Court's decision, the Eighth Circuit stated that this Court found that "Jackson did not have an intellectual disability because he did not demonstrate a specific link between [adaptive deficits] and subaverage intellectual functioning." *Jackson v. Kelley*, 898 F.3d 859, 869 (8th Cir. 2018). In its prior decision, this Court repeated DSM-V's requirement that adaptive deficits be directly related to intellectual deficits, and the Court recited Dr. Macvaugh's testimony that he could not determine whether Jackson's history of adaptive deficits was related to intellectual deficits. However, despite the Eighth Circuit's conclusion, this Court made <u>no</u> definitive finding as to whether Jackson is intellectually disabled.

this requirement "largely duplicates" the second prong under § 5-4-601(a), *see Sasser v. Hobbs*, 735 F.3d 833, 845 (8th Cir. 2013), the Court found that Jackson had failed to satisfy his burden of proof as to the fourth prong.

Jackson's failure to prove significantly subaverage general intellectual functioning and a significant deficit or impairment in adaptive functioning precluded relief under *Atkins*. But given the serious consequence of Court's decision, and recognizing that Jackson does indeed have intellectual impairments, the Court went further to consider whether he possibly possessed the characteristics and deficits described in *Atkins*, which the Supreme Court found lessen personal culpability to such an extent that the penological purposes of retribution and deterrence[24] are not served, rendering imposition of the death penalty cruel and unusual punishment. These traits include acting on impulse

---

[24]Jackson committed his second capital murder while serving a life sentence for his first capital murder, which may implicate a third valid penological interest: prevention of future crime. However, the Supreme Court has never embraced incapacitation as a justification for the death penalty, reasoning that a sentence of life without parole is enough to prevent future crime. *See Baze v. Rees*, 553 U.S. 35, 78, 128 S. Ct. 1520, 1546–47, 170 L. Ed. 2d 420 (2008)("While incapacitation may have been a legitimate rationale [for capital punishment] in 1976, the recent rise in statutes providing for life imprisonment without the possibility of parole demonstrates that incapacitation is neither a necessary nor a sufficient justification for the death penalty."); *Ring v. Arizona*, 536 U.S. 584, 614-15 (2002)(Breyer, J., concurring)(noting "the continued difficulty of justifying capital punishment in terms of its ability ... to incapacitate offenders"); *California v. Ramos*, 463 U.S. 992, 1023 (1983) (Marshall, J., dissenting)(arguing that capital punishment "simply cannot be justified as necessary to keep criminals off the streets," and that life imprisonment and, if necessary, solitary confinement would fully accomplish the aim of incapacitation).

rather than a premeditated plan, acting as a follower, and a reduced capacity to process information, communicate, learn from experience, engage in logical reasoning, control impulses, and understand the reaction of others. *See Atkins*, 536 U.S. at 320-21, 112 S. Ct. at 2251-52. This Court observed, among other things, that Jackson's careful planning and premeditation in prison that resulted in the death of Scott Grimes indicated that he is not "'so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus [regarding the death penalty].'" *Jackson v. Norris*, No. 5:03-CV-00405 SWW, 2016 WL 1740419, at *23 (E.D. Ark. Mar. 31, 2016), *rev'd and remanded sub nom. Jackson v. Kelley*, 898 F.3d 859 (8th Cir. 2018)(quoting *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250).

### III. The Eighth Circuit's Reversal and Remand

The Eighth Circuit found that this Court committed the same errors that the Supreme Court condemned in *Moore I*; specifically, that the Court (1) relied too heavily on Jackson's perceived strengths, rather than his deficits; (2) inappropriately found that Jackson was not intellectually disabled because his adaptive strengths outweighed his adaptive deficits; (3) gave significant weight to skills that Jackson may have developed in prison; and (4) placed too much emphasis on the existence of other diagnosed disorders. Additionally, the Court of Appeals perceived that this Court attempted to bolster its analysis by considering

whether the undisputed facts regarding Jackson's crimes indicated that he possesses the characteristics of intellectually disabled persons described in *Atkins,* commenting that this analysis "essentially required Jackson to prove that there was a nexus between his mental capacity and his crime—i.e., that his criminal conduct reflected mental disability." *Jackson v. Kelley*, 898 F.3d at 866.

The Court of Appeals has directed this Court to reconsider its decision in view of *Moore* and has instructed that this Court's findings shall include the following:

> [T]he standard error of measurement as applied to Jackson's IQ tests administered during his youth; whether Jackson's adaptive functioning deficits are related to his subaverage intellectual functioning without requiring Jackson to demonstrate a specific link between the two; and *whether Jackson's adaptive functioning deficits* rather than his adaptive functioning strengths *indicate that he is not intellectually disabled*.

*Jackson v. Kelley*, 898 F.3d 859, 869 (8th Cir. 2018)(emphasis added).

## IV. Analysis on Remand

### A. Intellectual Functioning

In remanding this case, the Eighth Circuit observed: "In line with the Supreme Court and the DSM-V, we have previously held that courts should take into consideration a margin of error of plus or minus five points on these tests because it is possible to diagnose intellectual disability 'in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.'" *Jackson v. Kelley*, 898 F.3d 859, 863–64 (8th Cir. 2018)(quoting *Sasser v. Hobbs*, 735 F.3d

833, 843 (8th Cir. 2013)). And the Court of Appeals has specifically instructed:

"The [district] court shall include in its reconsideration: the standard error of measurement as applied to Jackson's IQ tests administered during his youth." *Id.,* 898 F.3d at 869.

For reasons discussed at length in its prior decision, this Court found that Jackson's 50 and 56-point full scale IQ scores obtained from the administration of the WAIS-IV in 2011 do not qualify as reliable evidence of his intellectual functioning. The Eighth Circuit did not disturb that finding on appeal, and it remains this Court's finding. Further, this Court specifically found that Jackson's full-scale IQ scores obtained from 1977 to 1986, which ranged from 72 to 81, *did not* preclude a finding that he met the criteria for intellectual disability, and consistent with the Supreme Court's directive in *Hall*, the Court considered evidence of Jackson's adaptive functioning. Given the lack of specific test data regarding Jackson's early intelligence assessments, the Court, like Dr. Macvaugh,[25]

_____

[25]As the Court understood Dr. Macvaugh's in-person testimony and forensic report, he could not employ the SEM method to account for error with respect to Jackson's early IQ scores because, except for the test administered to Jackson in 1977, there is no information about the version of tests administered to Jackson in his youth. Accordingly, rather than construct a confidence interval for each of the four full-scale IQ scores, in reaching his overall "clinical" opinion that Jackson fell within the low to mid-borderline range of intelligence, Dr. Macvaugh considered that Jackson's scores on multiple different tests obtained scores falling within the same general range: low to mid-borderline. As previously explained, Dr. Macvaugh also considered other information in reaching his "clinical" opinion that Jackson's intellectual functioning did not qualify him as intellectually disabled—including Jackson's in-person interview responses and his prison-recorded telephone conversations.

did not attempt to construct a confidence interval for Jackson's early scores. But in keeping with the Eighth Circuit's instructions on remand, the Court will now construct a score range for each of Jackson's early, full-scale IQ scores by adding five points to and subtracting five points from each observed score. The value of this step is uncertain because without more information about the tests administered, the Court is unable to assign a specific confidence level or percentage to these ranges, and in the end, the Court's inquiry will not change as it will once again consider evidence of Jackson's adaptive functioning.

As shown in the chart below,[26] Jackson's early full-scale scores of 72, 73, 81, and 74, adjusted for an across-the-board SEM of plus or minus five points, yield the following ranges: 67 to 77; 68 to 78; 76 to 86; and 69 to 79. These adjusted ranges include IQ scores at, below, and above 70, and as the Court recognized in its prior decision, Jackson's early scores do not preclude a finding that he is intellectually disabled, but they are not conclusive, and an assessment of Jackson's adaptive functioning is necessary to determine the severity of his intellectual deficits.

---

[26]The chart's title columns contain the following abbreviations: Verbal Intelligence Quotient ("VIQ"); Performance Intelligence Quotient ("PIQ"); and Standard Error of Measurement ("SEM").

| Date | Age | Examiner | Test (version) | VIQ | PIQ | FSIQ | SEM*** | Range |
|------|-----|----------|----------------|-----|-----|------|--------|-------|
| 4/26/77 | 6 | Unknown | SBIS(?)* | ? | ? | 72 | 5 | 67 to 77 |
| 12/09/77 | 7 | Johnson | WISC-R | 60 | 90 | 73 | 5 | 68 to 78 |
| 2/18/82 | 11 | Unknown | WISC(?)* | 72 | 92 | 81 | 5 | 76 to 86 |
| 9/22/86 | 16 | Unknown | WISC(?)** | 62 | 91 | 74 | 5 | 69 to 79 |

*Stanford Binet Intelligence Test (unspecified version) and Wechsler Intelligence Scale for Children (unspecified version), referenced in testimony by Dr. Patty Koehler, Director of Special Education for the Little Rock School District, during the sentencing phase of Jackson's trial for the capital murder of Charles Colclasure (test reports not available for review)

**Wechsler Intelligence Scale for Children (unspecified version), referenced in testimony by Dr. Glen White, a clinical psychologist, during an omnibus hearing in proceedings for the capital murder of Charles Colclasure (test reports not available for review)

***The unique SEMs associated with the tests administered to Jackson are unknown.

## B. Adaptive Functioning

DSM-5 provides that adaptive functioning "is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures." DSM-5, at 37. "Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible." *Id*. When Drs. Moneypenny and Macvaugh evaluated Jackson in 2011, he was forty years old and had lived his entire adult life, and a portion of his adolescent years, in prison. Not one adult

from Jackson's childhood was available to corroborate how he functioned in the open community. Calvin Jackson confirmed that his twin brother had behavior problems as a child, attended special education classes, and had problems communicating, but his ability to recall Jackson's behaviors with specificity was understandably limited. As Dr. Macvaugh explained, given Jackson's unique circumstances, it is not possible to obtain reliable information about Jackson's adaptive functioning in the open community using standardized measures and knowledgeable informants, as recommended under DSM-5.

DSM-5 also provides that "additional sources of information include educational, developmental, medical, and mental health evaluations." *Id.* Educational and related mental health records from Jackson's childhood document that he had deficits in each domain of adaptive functioning. Relevant to the conceptual domain, Jackson lacked basic functional academic skills, and he appeared to suffer from a language or communication disorder. Jackson also had severe behavioral problems, indicating deficits in the social domain, and his academic record demonstrated that he had difficulty with self-management and staying on task, indicating possible deficits in the practical domain.

Dr. Macvaugh found it impossible to determine whether Jackson's apparent deficits in adaptive behavior, exhibited in his childhood, were due to subaverage intellectual functioning, untreated AHDH, a learning or language disorder, brain

damage, or a combination of these conditions.  Particularly informative to Dr.

Macvaugh was a 1977 psychological report by Dr. Bill Johnson, a clinical

psychologist who assessed Jackson at the Elizabeth Mitchell Children's Center.[27]

Dr. Johnson noted that Jackson had severe problems in conceptualization, an

extremely short attention span, and limited capability of dealing with abstract

verbal material, and he suspected that the extreme discrepancy between Jackson's

verbal and performance IQ scores pointed to severe organic damage in the left

hemisphere.[28]

Although Dr. Macvaugh viewed Jackson's comorbid conditions a roadblock

to  assessing Jackson's adaptive functioning, *Moore I* clearly requires a different

approach.  Following *Moore I*, the Eighth Circuit has advised that DSM-5's

language requiring that deficits in adaptive functioning be "directly related" to

intellectual impairments does not require "a specific connection between

subaverage intellectual functioning and adaptive behavior deficits." *Jackson v.

Kelley*, 898 F.3d 859, 869 (8th Cir. 2018).  Instead, Jackson "must show only that

deficits related to intellectual functioning exist." *Id.*   The record shows that

Jackson's documented deficits in the conceptual, social, and practical domains in

---

[27]*See* Resp't *Atkins* Hr'g Ex. #6 (Macvaugh Forensic Report, 56).
[28]*Id.*

childhood, regardless of etiology, were at least related to his deficits in intellectual functioning.

In its previous order, the Court noted that Drs. Moneypenny and Macvaugh testified that Jackson's ability to function in prison, standing alone, cannot serve as a valid index of his adaptive functioning. However, both experts agreed that clinical standards did not preclude consideration of Jackson's institutional adaptation and that such evidence should be considered. Accordingly, the Court considered evidence regarding Jackson's activities in prison, most of which indicated adaptive strengths. In remanding this case, the Eighth Circuit stated that like the CCA in *Moore I*, this Court placed too much emphasis on Jackson's adaptive strengths and functioning in prison and "inappropriately found that Jackson was not intellectually disabled because his adaptive strengths outweighed his adaptive deficits."[29] *Jackson v. Kelley*, 898 F.3d at 865.

In *Moore I*, the Supreme Court cautioned against overemphasizing adaptive strengths and relying too much on prison-based development, but the Court provided no guidance as to when and to what extent such information is properly considered. The *Atkins* rule is founded on a consensus that intellectually disabled offenders are less culpable for the crimes they commit because, among other

---

[29]Once again, this Court did not so find but only found that Jackson had failed to carry his burden of proof.

things, "there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan." *Atkins,* 536 U.S. at 318, 122 S. Ct. at 2250. Because the *Atkins* rule is fundamentally about the offender's culpability for his crime, Jackson's adaption to prison, where he planned and carried out his second capital murder, seems particularly relevant. However, given the Eighth Circuit's admonition to this Court and the Supreme Court's increasingly generous standard in *Atkins* cases, the Court places no weight on Jackson's adaptive strengths, his activities in prison, or Dr. Macvaugh's clinical assessment of Jackson's intellectual functioning. As this Court understands it, the current legal standard for *Atkins* claims requires a Court to find that a defendant is intellectually disabled if the defendant produces an IQ score between 70 and 75 or lower and shows that he had a significant adaptive deficit, such as a learning disability, as a child. This standard is arguably more generous that the clinical criteria for intellectual disability set forth in DSM-5, which stresses the importance of clinical judgment, such as Dr. Macvaugh's "clinical" assessment of Jackson's intellectual functioning.

The Eighth Circuit has instructed that this Court shall include in its analysis "whether Jackson's adaptive functioning deficits rather than his adaptive functioning strengths indicate that he is not intellectually disabled." *Jackson v. Kelley*, 898 F.3d at 869. As one would expect, Jackson's record of adaptive

deficits (*i.e.*, academic and behavioral problems experienced in childhood) provide no indication that he is *not* intellectually disabled.

## V. Conclusion

Upon reconsideration, the Court finds that Jackson has significant deficits in adaptive functioning as required under the second prong of Arkansas's intellectual disability statute. And viewing Jackson's early IQ scores together with evidence of his adaptive deficits, the Court finds that Jackson also meets the requirement of significantly subaverage intellectual functioning, as required under the first prong. Jackson also meets the third and fourth prongs of the Arkansas statute. As stated previously in this case, it is undisputed, and the Court finds, that the onset of Jackson's deficits occurred during the developmental period and were present before his eighteenth birthday,[1] and Jackson has proven deficits in adaptive behavior, without regard to the age of onset.

IT IS THEREFORE ORDERED that Petitioner Jackson's petition for a writ of habeas corpus is GRANTED as to his claim that he is ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002). Jackson's conviction for capital murder remains, but his death sentence is set aside, and the

---

[1]On cross-examination, when asked whether there was "no dispute here that whatever he had, whatever Mr. Jackson has, its onset [was] before age eighteen," Dr. Macvaugh answered, "Correct." ECF No. 112, at 26.

State must change his penalty to life imprisonment without parole.  A judgment

and decree so ordering will be entered separately.

IT IS SO ORDERED THIS 23RD DAY OF MARCH, 2020.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE